BETTY S. STRYKER, individually, and BETTY
KEUSCHER, Temporary Administratrix of the Estate of
STEPHEN CHRISTOPHER STRYKER, deceased,
Plaintiffs-Appellants, *v.* QUEEN'S MEDICAL
CENTER, Defendant-Appellee

NO. 5866

DECEMBER 21, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA,
MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

Stephen Stryker, a 21-year old psychiatric patient at
Queen's Medical Center, fell or jumped to his death from the

Pauahi Wing of Queen's. Thereafter, plaintiffs-appellants, Betty Stryker, decedent's mother, and Betty Keuscher, temporary administratrix of decedent's estate, brought a consolidated survival and wrongful death action[1] against Queen's, claiming failure to provide adequate psychiatric care, improper administration of drugs, and inadequate supervision of the deceased. A jury trial was held in the First Circuit Court and, after presentation of all the evidence, defendant moved for a directed verdict. The trial court partially granted the motion, determining that Stryker was contributorily negligent in voluntarily ingesting a drug and that his contributory negligence was a proximate cause of his death. The issue of Queen's negligence was submitted to the jury by special interrogatories. The jury found that although Queen's was negligent, its negligence was not a proximate cause of Stryker's death. This appeal followed.

We affirm.

On January 1, 1972, Stephen Stryker voluntarily ingested an unknown drug from which he suffered a severe reaction. He was taken to Queen's emergency room where his condition was found to be rigid, unresponsive and convulsive. The next day, he was discharged to the care of his father and brother. However, during the following three days, Stryker's behavior became increasingly bizarre and agitated. Stryker returned to Queen's emergency room on January 5 and was given tranquilizers. He was again discharged to the care of his brother and father and given a two-day supply of oral tranquilizers.

On January 7, 1972, Stryker was admitted as an inpatient in the psychiatric ward of Queen's. His symptoms indicated that he was suffering from an acute schizophrenic break. On January 9, 1972, Stryker left the closed security ward on the ground floor and either fell or jumped to his death from above the sixth floor of the Pauahi Wing.

Appellants contend on appeal that the trial court erred in

---

[1] Suit was brought pursuant to HRS § 663-7 (1976 Repl.) providing for survival actions and HRS § 663-3 (1976 Repl.) providing for wrongful death actions.

partially granting Queen's motion for directed verdict, in refusing to give plaintiffs' requested instruction concerning *res ipsa loquitor*, and in refusing to give plaintiffs' requested instruction regarding the defendant's standard of care. We consider each issue separately below.

I.

Appellants argue that the trial court erred in finding that Stephen Stryker was contributorily negligent and that such negligence was a proximate cause of his death. This error, appellants assert, led the jury to determine that although Queen's was negligent, its negligence was not a proximate cause of Stryker's death. If appellants' argument is correct, the alleged error would have affected their substantial right to have the jury independently determine whether Queen's negligence was a proximate cause of Stryker's death. Thus, if the trial court did err and if such error affected the jury's verdict, the verdict must be set aside and the judgment reversed. H.R.C.P., Rule 61; HRS § 641-2 (1976 Repl.)[2]

We decline to decide whether the trial court erred in partially granting a directed verdict. We think that, even assuming the trial court did err, such error would have been rendered harmless by the court's subsequent instructions to the jury. *See Lyon v. Bush*, 49 Haw. 116, 123, 412 P.2d 662, 667 (1966).

After partially granting Queen's motion for a directed verdict, the trial court informed the jury that it had deter-

---

[2] Rule 61. HARMLESS ERROR. No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

HRS § 641-2 (1976 Repl.) states, in part,

No judgment, order or decree shall be reversed, amended or modified for any error or defect unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant.

mined as a matter of law that Stryker was negligent and that his negligence was *a* proximate cause of his death.[3] Subsequently the court instructed the jury that it "must determine whether the defendant was negligent and whether such negligence was a proximate cause of [Stryker's] death." The court also instructed the jury that there can be more than one proximate cause of an injury.[4] Furthermore, it instructed the jury that by the court's instructions, rulings, actions or remarks, it did not intend to impose any opinion or make any suggestions as to how the remaining issues of the case should be resolved.[5] Finally, the jury was directed to give its verdict by special interrogatories. The first interrogatory asked whether Queen's Medical Center was negligent. The second interrogatory, to be answered only if the first interrogatory was answered in the affirmative, then asked whether such negligence was a proximate cause of decedent's death.

Appellants argue that "the only rational explanation for the jury's decision is that the jury accepted as determinative the court's ruling that Stephen's [Stryker's] negligence was *the* proximate cause of his death." (Emphasis added.) Appel-

---

[3] After hearing arguments and ruling on the motion without the jury present, the Court summoned the jurors back into the courtroom and stated:

Ladies and gentlemen of the jury, one of the powers invested in [me] under Rule 50 of the Hawaii Rules of Civil Procedure I have determined as a matter of law that the decedent, Steven Stryker, was negligent and that his negligence was a proximate cause of his death.

[4] The Court's instructions number 21 and 22, given to the jury, stated:

The "proximate cause" of an injury is that cause which in direct, unbroken sequence, produces the injury, and without which the injury would not have occurred.

The law does not say that there can be only one proximate cause of an injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things, or the conduct of more than one person, may operate either independently or together to cause injury; and in such [a] case, each may be a proximate cause of the injury.

[5] The Court's instruction number 5, given to the jury, stated:

Neither in these instructions nor in any ruling, action or remark that I have made during the course of this trial have I intended to interpose any opinion or suggestion as to how I would resolve any of the issues of this case.

lants' contention is without merit. They misconstrue the trial court's ruling and subsequent statement to the jury. The trial court did not inform the jury that Stryker's negligence was *the* proximate cause of his death; it told them that his negligence was *a* proximate cause of his death.

We are unable to discover, and appellants have failed to show us, how the trial court's ruling that Stryker's negligence was a proximate cause of his death led the jury to reach the conclusion that Queen's negligence was *not* another proximate cause of his death.

II.

Appellants also contend that the trial court erred in refusing to give plaintiffs' requested instruction No. 8[6] concerning *res ipsa loquitur.*

Irrespective of whether the doctrine of *res ipsa loquitur* applies in this case, the instruction was improperly worded. In *Cozine v. Hawaiian Catamaran, Ltd.*, 49 Haw. 77, 87, 412 P.2d 669, 678 (1966), we stated that "an instruction covering the doctrine of *res ipsa loquitur* should permit, but not compel, an inference of negligence." *See Guanzon v. Kalamau*, 48 Haw. 330, 335, 402 P.2d 289, 292 (1965) (note 3). Without deciding whether the remainder of the instruction is proper, we note that the instruction compels rather than permits an inference that Queen's was negligent and that such negligence was a proximate cause of Stryker's death; therefore, the trial court did not err in refusing to give it.

---

[6] PLAINTIFF'S REQUESTED INSTRUCTION NO. 8:

If you find from the evidence in this case that it is the kind of occurrence which ordinarily does not occur in the absence of someone's negligence, and that when Stephen Stryker died he was exclusively under the control and custody of Queen's Medical Center and that Stephen Stryker's death was not due to any voluntary action on the part of Stephen Stryker, *you are instructed that an inference arises* that a proximate cause of the occurrence was some negligent conduct on the part of Queen's Medical Center (emphasis added.) The plaintiffs may properly rely on *res ipsa loquitur* although Stephen Stryker participated in events leading to the occurrence if the evidence excludes his conduct as the responsible cause.

### III.

Appellants finally contend that the trial court erred in refusing to give plaintiffs' requested instruction No. 3.[7] We disagree. The trial court correctly instructed the jury on the duty owed by a hospital to a patient and the standard of care to be used in determining whether the hospital had fulfilled that duty.[8] *Vistica v. Presbyterian Hospital & Medical Center*, 67 Cal. 2d 465, 62 Cal. Rptr. 577, 432 P.2d 193 (1967); *Adams v. State*, 71 Wash. 2d 414, 429 P.2d 109 (1967); *Hunt v. King County*, 4 Wash. App. 14, 481 P.2d 593 (1971); Annot., 70 A.L.R.2d 347, 348 (1960). The trial court further instructed the jury that certain precautionary guidelines regarding the care and treatment of psychiatric patients were in effect at the time of Stryker's death and that a failure to follow such guidelines could be considered as evidence of negligence.[9]

---

[7] PLAINTIFFS' REQUESTED INSTRUCTION NO. 3:

Where the psychiatric staff of a hospital is *placed on notice* of a patient's intent to escape because the patient has done so before, the staff is under a duty to exercise extraordinary precautions to prevent another escape.

[8] The Court's instruction on duty and standard of care stated:

It is the duty of a hospital, such as defendant, to use reasonable care in furnishing a patient the care, attention and protection reasonably required by his mental and physical condition.

The standard of reasonable care required of a hospital is the care, skill and diligence ordinarily exercised by hospitals generally under similar circumstances.

The extent and character of the care that a hospital owes its patients depends on the circumstances of each particular case. This duty includes the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition, which is known to the hospital through its agents and servants charged with the duty of looking after and supervising its patients, may require. This duty also extends to safeguarding and protecting the patient from any known danger to himself which may be due to his mental or physical condition, and to use reasonable care to prevent it. This duty extends only to known or reasonably foreseeable dangers but not to dangers not reasonably foreseeable.

A failure to perform within such standard of reasonable care is negligence.

[9] The Court's instruction was as follows:

On January 9, 1972, the psychiatric ward of Queen's Medical Center had certain precautionary guidelines in effect concerning the care and treatment of

Thus, we find no error in the trial court's refusal to give the proposal instruction.

Affirmed.

*Garry N. Hagerman* for plaintiffs-appellants.

*Dennis E. W. O'Connor (Anthony, Hoddick, Reinwald & O'Connor* of counsel) for defendant-appellee.

---

psychiatric patients. These precautionary guidelines are in evidence in this case. If you find from all of the evidence that the staff of Queen's Medical Center did not follow these precautionary guidelines, and that the failure to do so was a proximate cause of Stephen Stryker's death, then you may consider the failure, if any, to follow the precautionary guidelines as evidence of negligence on the part of Queen's Medical Center.

The guidelines referred to in the Court's instruction provided that a patient on Closed Ward Status be placed in one of three categories. Stephen Stryker was classified as a Closed Ward Status, Maximum Security patient. The guidelines stated:

The three categories of Closed Ward Status imply that in each category certain procedures will be followed. The physician in charge may occasionally modify them if, in his judgment, some procedures within a category are not necessary. The procedures are as follows:

"Minimum Precautions"

1. The patient may not leave the Ward except when accompanied by a staff member.

2. The patient may not go off the grounds except with a family member or a friend.

"Moderate Precautions" additionally include the following:

1. The patient's whereabouts is known at all times by a member of the staff.

2. The patient is dressed in hospital clothes unless otherwise ordered by the patient's physician.

3. Personal possessions and articles which may be used harmfully by the patient may be removed.

"Maximum Precautions" additionally include the following:

1. An individual nursing staff member is responsible for the patient's care at all times.

2. The patient is usually kept within the line of vision; but if the degree of risk is intense, the patient may be kept within "arm's reach".

3. The patient may be secluded by the nursing staff.

4. The patient may be physically restrained by the nursing staff.

5. If the nursing staff is too busy to keep the patient under maximum precautions, then the physician should consider ordering special duty nurses during those periods when the nursing staff is unable to handle a patient placed in that category.

6. These orders must be recorded by physicians daily.