604 P.2d 1198 (1979)
Michael FIGUEROA, a minor, by his next friend, Louis Figueroa, and Individually, Louis Figueroa and Shirley Pimental, Plaintiffs-Appellees, Cross-Appellants,
v.
STATE of Hawaii, Defendant-Appellant, Cross-Appellee.
No. 6437.
Supreme Court of Hawaii.
December 31, 1979.
Reconsideration Denied January 29, 1980.
As Amended February 26, 1980.
*1199 Charlotte E. Libman, Deputy Atty. Gen., Honolulu (Charles F. Fell and Nelson S.W. Chang, Deputy Attys. Gen., Honolulu, with her on the briefs), for defendant-appellant, cross-appellee.
David W. Hall, Honolulu (William S. Hunt, Honolulu, with him on the briefs; Hart, Leavitt, Hall & Hunt, Honolulu, of counsel), for plaintiffs-appellees, cross-appellants.
David W. Hall (Edmunds and Hall of counsel) and William S. Hunt (Hart, Leavitt & Hunt of counsel), for Plaintiffs-Appellees, Cross-Appellants, for the motion.
Before RICHARDSON, C.J., KOBAYASHI, OGATA and MENOR, JJ., and MARUMOTO, Retired Justice, in place of KIDWELL, J., absent.
*1200 OGATA, Justice.
Plaintiffs-appellees, cross-appellants, Michael Figueroa, Louis Figueroa and Shirley Pimental (hereinafter appellees) instituted an action against the defendant-appellant, cross-appellee, State of Hawaii (hereinafter appellant) to recover damages for an attempted suicide by appellee Michael Figueroa[1] while he was at the Hawaii Youth Correctional Facility, also known as the Koolau Boys' Home (hereinafter HYCF or Boys' Home). After a bench trial,[2] the court below found that the State was negligent in its supervision of Michael, had violated certain of his guarantees under the State and Federal Constitutions and was liable for injuries prior to and subsequently caused by his attempted hanging. Both appellant and appellees appeal from the judgment of $1,385,250.00 entered in favor of appellees. We vacate the judgment and dismiss the cross-appeal; we further remand the first cause of action of the second amended complaint for a new trial.

I
In November 1971, Michael, who was then sixteen years old and who had never run afoul of the law, was involved in three armed robberies with two other youths with whom he had become acquainted not more than two weeks prior to his apprehension. Michael had dropped out of high school in 1971, but had been employed at a car wash at the time of his involvement in the robberies. Upon adjudication as a law violator, Michael was committed by the Family Court to the Boys' Home for the period of his minority, the Family Court retaining jurisdiction over him for 30 days.
The HYCF is a juvenile home operated by the Corrections Division of the State of Hawaii under the Department of Social Services and Housing. The objectives of the facility are the "detention, management, education, employment, reformation, and maintenance" of its residents. HRS § 352-8 (1976). The HYCF is located in Kailua, on the island of Oahu, and consists of separate schools for boys and girls. The Boys' Home consists of two cottages, Kaala and Olomana. On the boys' side of the facility, there is an administration building to the right with Olomana Cottage situated on a hill to the left.
Olomana Cottage is structured around a courtyard, and its main entrance is at about the center of the building. On its right are the staff rooms, i.e., a club room, a locker room, a library, staff offices, a living room, a dining room and a kitchen. To the left of the entrance, a door enters into a foyer leading into a corridor, on each side of which are five isolation rooms, ten in all, each of which has its own door. There is a shower facility within the foyer leading to the isolation rooms. Continuing around the building, there is a dormitory referred to as "B" dorm, a control room, bathroom facilities and "A" dorm.
During the time Michael was at Olomana Cottage, approximately 24 boys were assigned to that cottage. The cottage team consisted of one cottage administrator, two correctional supervisors, 11-12 correctional care workers (three per shift), one social worker and one recreational specialist. Also available at the facility were a fulltime registered nurse and a chaplain. A psychiatrist was available once or twice a week; a psychologist was available two or three times a week; a medical doctor came in once a week and a dentist came in twice a week.
At all relevant times herein, the Boys' Home employed a behavior modification program. Under the behavior modification program utilized there, a point system was established and each new admittee was given 100 points upon arrival. Under this program, desirable behavior was rewarded with points and undesirable behavior was punished by removing points. The points were used by the residents to obtain privileges  to *1201 buy sodas, to use the telephone and to be able to go home.
On March 6, 1972, Michael entered the Boys' Home and was assigned to Olomana Cottage. He was placed in "close" control classification and in an isolation room, which was standard procedure for all new admittees. The staff at the Boys' Home considered him to be a short-term commitment and Michael himself believed that he could be released in thirty days. On March 13, the Cottage Administrator, Vernon Chang (hereinafter Chang), ordered Michael to be released from isolation but Michael requested to be allowed to sleep in the isolation room and was permitted to do so. From March 20, he slept in the Olomana Cottage "A" dorm. On March 22, Michael's classification was changed to "medium" control. On numerous occasions, Michael spoke to Chang and other staff members about his placement in the Boys' Home and his desire to be released at the end of thirty days. He also told staff members that "he didn't belong with this type of boys." On April 3, 1972, another resident informed Chang of Michael's plan to "overpower the staff ... and lock them in the chiller" in order to escape. Michael was restricted to cottage confinement as a result of the discovery of his escape plan. On or about April 11, 1972, a determination was made by the HYCF that Michael was a regular commitment. Chang told Michael that his commitment was changed from short-term to regular, which would be for the duration of his minority. During his stay at the Boys' Home, Michael was on several occasions punched, slapped and beaten by other residents and although the staff did not observe most of the beatings, on at least one occasion, a staff member observed such beating and did not stop it. Michael was forced by some of the other residents to wash their clothes and do their chores.
The critical date in this narrative is April 11, 1972. This was the first day that Michael attended school which is on the grounds of the Boys' Home. A bus took the boys to school and returned them to their cottage for lunch. When the bus returned to Olomana Cottage shortly after 11 o'clock a.m., Michael got off the bus and ran. Four other residents who were also on the bus chased Michael and apprehended him approximately 400 or 500 yards away in a nearby residential area and proceeded to punch and slap him while restraining him. Two staff members followed in a car. While returning to the Boys' Home with the boys who apprehended him and the two staff members, Michael pleaded not to be placed in isolation and struggled with his captors.
When he was returned to Olomana Cottage, Michael's lip was cut and there was some blood on his lips. Chang spoke with Michael for 5-10 minutes and then ordered staff member, Simeon Domingo (hereinafter Domingo) to confine the boy in isolation and to check him every half hour. Chang testified that Michael "reacted no differently from ... scores of other kids who ... have ... run away and [were] apprehended or brought back." The general practice at that time was to place a runaway in isolation to punish the undesirable behavior, to "cool him off" and to prevent communication with the other residents "so that [the runaway] cannot stir them up."
Michael was angry and excited when Chang talked to him at the Olomana Cottage; but according to Chang, Michael calmed down after their talk and had walked to the isolation room voluntarily with Domingo. An isolation room measures 7 feet wide, 10 feet long, and 8 feet high with one window with concrete grating. There is a toilet, a wash basin with running water and a bed. The door to the room has a small glass window. Michael entered the isolation room and sat on the bed. Domingo told Chang that Michael was still angry so Chang went to talk to Michael in the isolation room for 5-10 minutes and came out shortly before 12 noon. Michael wanted to see his father so Chang promised to contact the father and have him visit over the weekend. Domingo went back to the staff office and checked Michael later at about 12:30 and saw him lying on the bed so *1202 he returned to his office. Between 12:30 and 12:45, Chang called Domingo to tell Michael that his father was coming to visit him. When Domingo went back to the isolation cell and looked in, he saw Michael hanging by the neck with a strip of mattress covering around his neck, and attached to the window grating. Domingo had forgotten his key so he ran back to the staff office to get the key.[3] He cut Michael down and began rendering artificial respiration. Michael was unconscious. After Chang, who was in his office in the Administration Building, was notified about Michael's hanging, he and another staff member drove down to Olomana Cottage. Chang and Domingo alternately applied artificial respiration. Michael was taken by ambulance to Castle Memorial Hospital. Michael suffered permanent brain damage, permanent memory loss, was rendered mentally retarded and is incapable of taking care of his basic needs. The trial court concluded that the suicide attempt by Michael was a reasonably foreseeable consequence of the failure to follow rules and regulations applicable to HYCF, to provide treatment and protection which caused him serious mental distress so as to drive him into a "depressed mental condition sufficient to overcome his will to live," and thereby the State had breached its duty of reasonable care owed to Michael and had violated certain of Michael's constitutional rights as well. The trial court rendered a judgment in favor of the appellees and against appellant in a total amount of $1,385,250.00.
Among other things, the State contends that the court below erred in:
1. Concluding that the State breached the duty of reasonable care it owed to Michael,
2. Resolving the issue of monetary damages for constitutional violations.

II
The question of whether a defendant is liable in any particular case is to be determined by the application of general tort principles. Seibel v. City and County of Honolulu, 61 Hawaii ___, 602 P.2d 532 (1979); Rodrigues v. State, 52 Hawaii 156, 472 P.2d 509 (1970). As we have said in prior cases, the liability of the State is to be judged under the same principles of tort liability as those which determine the liability of private individuals in the same circumstances. HRS § 662-2 (1976); Ajirogi v. State, 59 Hawaii 515, 583 P.2d 980 (1978); Upchurch v. State, 51 Hawaii 150, 454 P.2d 112 (1969).
The State's duty to Michael to exercise reasonable care arises from the relationship created between the two as a result of Michael's commitment to the Boys' Home. Michael was committed to the Boys' Home by the Family Court and so long as he was in its custody, the law provides that the director of social services "shall be the guardian of the person of every child committed to or received at" HYCF. HRS § 352-9 (1976); see Restatement (Second) of Torts § 314A(4).
In order to determine whether or not the Boys' Home neglected its duty of care which it owed to Michael it is necessary first to inquire into the extent of care which the facility was required to give. The law demands such care as a reasonably prudent person would exercise under the same or similar circumstances but no person is required to take measures against a danger which the circumstances as known to him do not reasonably suggest as likely to happen. Haworth v. State, 60 Hawaii 557, 592 P.2d 820 (1979); Ajirogi v. State, supra; Miller v. Yoshimoto, 56 Hawaii 333, 536 P.2d 1195 (1975); Rodrigues v. State, supra.
The trial court specifically found that the State was negligent in failing to adhere to various rules and regulations of HYCF applicable *1203 to Michael, to put forth meaningful programs for the residents, to correctly adopt and clearly explain its voluminous rules and regulations, to provide in-service training for the staff, to safeguard Michael from physical and mental abuse by older residents, and to provide effective and accurate means of communication among the staff. These findings by the trial court are set forth in the margin.[4] The court further found that the State was negligent when it placed Michael in isolation after he ran away.
In the view we take of this case, however, the State's negligence, if any, upon which liability for the injuries sustained by Michael may be imposed, can only be predicated on the manner of the observation and supervision of Michael in the isolation cell after he was confined in isolation as a result of his runaway attempt. It is clear from the record that Michael's attempted suicide was not a risk which was a reasonably foreseeable result of those particular acts or omissions set forth in Conclusion of Law No. 6. It is abundantly clear that it was upon these findings that the trial court determined liability on the part of the State. In that respect the trial court grievously erred, and in the process failed to give full and definitive consideration to the two basic issues which we deem determinative in this case: (1) Whether the risk that Michael would hand himself was reasonably foreseeable by the HYCF staff; and (2) Whether, assuming such a risk was foreseeable, the HYCF staff exercised reasonable care in its supervision of Michael to prevent him from doing such harm to himself. And because the trial court failed to address itself definitively to these issues, and because the trial court's erroneous conception of the State's duty to Michael obviously infected its finding of liability on the part of the State, we vacate the judgment and remand for new trial upon correct legal principles.
The first question, then, is whether the risk that Michael would attempt to hang himself was sufficiently foreseeable by the HYCF staff as to require the exercise of reasonable care to supervise Michael to prevent him from doing such harm. The duty of penal institutions and detention homes to exercise reasonable care should extend to protection against suicide if such an event is reasonably foreseeable. Logue *1204 v. United States, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); Lucas v. City of Long Beach, 60 Cal. App.3d 341, 131 Cal. Rptr. 470 (1976); Dezort v. Village of Hinsdale, 35 Ill. App.3d 703, 342 N.E.2d 468 (1976); LaVigne v. Allen, 36 A.D.2d 981, 321 N.Y.S.2d 179 (1971); Maricopa County v. Cowart, 106 Ariz. 69, 471 P.2d 265 (1970); McBride v. State, 52 Misc.2d 880, 277 N.Y.S.2d 80 (1967), aff'd 30 A.D.2d 1025, 294 N.Y.S.2d 265 (1968). See Griffis v. Travelers Insurance Company, 273 So.2d 523 (La. 1973); Thornton v. City of Flint, 39 Mich. App. 260, 197 N.W.2d 485 (1972); Barlow v. City of New Orleans, 257 La. 91, 241 So.2d 501 (1970). For example, in Dezort v. Village of Hinsdale, supra, an intoxicated prisoner committed suicide in a jail cell and the jailers had known of his suicidal threats. The trial court had granted defendants' motion for summary judgment on the grounds that, as a matter of law, the defendants had no duty to prevent the suicide. The appellate court reversed and agreed with the plaintiffs that in the particular circumstances established by the pleadings, the duty to guard against the possibility of suicide did not create an unreasonable burden. Conversely, in the absence of actual or constructive notice of the inmate's suicidal behavior, there is no duty to prevent a suicide. For example, in Lucas v. City of Long Beach, supra, plaintiffs' decedent hung himself in his jail cell. He had been intoxicated but had not exhibited any suicidal behavior. The appellate court reversed the jury verdict for plaintiffs.
Similarly, cases dealing with patients in general and mental hospitals recognize that the extent of the duty or obligation is determined by facts knowledgeable to the custodian and a hospital is liable for a suicide only if, under the circumstances, it could reasonably have anticipated the suicide. Stryker v. Queen's Medical Center, 60 Haw. 214, 587 P.2d 1229 (1978); Bornmann v. Great Southwest General Hospital, Inc., 453 F.2d 616 (5th Cir.1971); Frederic v. United States, 246 F. Supp. 368 (E.D.La. 1965); Broussard v. State, 356 So.2d 94 (La. App. 1978); Horton v. Niagara Falls Memorial Medical Center, 51 A.D.2d 152, 380 N.Y.S.2d 116 (1976); Charouleau v. Charity Hospital, 319 So.2d 464 (La. App. 1975); Harris Hospital v. Pope, 520 S.W.2d 813 (Tex.Civ.App. 1975); Slater v. Missionary Sisters of the Sacred Heart, 20 Ill. App.3d 464, 314 N.E.2d 715 (1974); Hunt v. King County, 4 Wash. App.2d 14, 481 P.2d 593 (1971); Dalton v. State, 34 A.D.2d 605, 308 N.Y.S.2d 441 (1970); Wright v. State, 31 A.D.2d 421, 300 N.Y.S.2d 153 (1969); Meier v. Ross General Hospital, 69 Cal.2d 420, 71 Cal. Rptr. 903, 445 P.2d 519 (1968); Adams v. State, 71 Wash.2d 414, 429 P.2d 109 (1967); Kent v. Whitaker, 58 Wash.2d 569, 364 P.2d 556 (1961); Marks v. St. Francis Hospital and School of Nursing, Inc., 179 Kan. 268, 294 P.2d 258 (1956); Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743 (1953); Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S.W.2d 450 (1948); Paulen v. Shinnick, 291 Mich. 288, 289 N.W. 162 (1939); Smith v. Simpson, 221 Mo. App. 550, 288 S.W. 69 (1926).
Thus, applying these principles, the trial court could then make a determination whether under the facts and circumstances of this case it was reasonably foreseeable that Michael would hang himself because he was placed in an isolation cell. In the event that the trial court found that it was reasonably foreseeable that Michael would be likely to injure himself, the court was required to determine the standard of care and whether the HYCF staff used reasonable care and caution under the circumstances in placing and supervising Michael in his isolation cell.
Of course, the reasonableness of care in supervision should be determined in part by the nature of the institution. The Boys' Home is a juvenile detention home. It is not a hospital for which, under certain circumstances, the duty to exercise reasonable care would include measures that could not reasonably be expected in a juvenile detention home. See Johnson v. Grant Hospital, 32 Ohio St.2d 169, 291 N.E.2d 440 (1972); Bogust v. Iverson, 10 Wis.2d 129, 102 N.W.2d 228 (1960).
*1205 The State is not liable in this case as would an insurer of the residents' safety when the duty is only one of reasonable care under the circumstances. Under the circumstances of the case, we cannot say that the decision to place Michael in isolation was unreasonable. There was evidence that placement of runaways in isolation was practiced by the traditional juvenile institutions. Michael had attempted to run away and his confinement in isolation was to punish him and to let him "cool off." The record clearly shows that Michael did not have any history of suicide attempts prior to his admission to the HYCF.
Accordingly, we remand the above two issues relevant to the appellant's negligence for retrial.

III
Appellees also alleged in the second cause of action of the second amended complaint that while Michael was a resident at the Boys' Home, he suffered deprivations of certain constitutional rights guaranteed by the State and Federal Constitutions. The trial court found that the following acts or omissions violated Michael's rights to due process, freedom from cruel and unusual punishment, and rehabilitative treatment:
1. Failure to provide for a hearing before subjecting him to the behavior modification program.
2. Placement in an isolation cell in the absence of "very exceptional circumstances."
3. Failure to provide adequate treatment and care reasonably calculated to bring about the reformation of a minor.
The trial court awarded Michael $15,000 for "pre-hanging physical pain and suffering and the mental anguish and emotional distress." The court explained that this award could be based on common law negligence or on constitutional violations so that the award could be upheld on negligence alone. However, in this case we are squarely faced with the question as to whether the State can be held liable in money damages for alleged constitutional violations.
The State argues that the court below erred in adjudicating the constitutional claims because the doctrine of sovereign immunity withheld from the court jurisdiction over the State on claims for money damages for alleged constitutional deprivations. We turn to the respective constitutional, statutory and decisional law arguments that are advanced as support for the action taken by the lower court.
It is well-established that the State as sovereign is immune from suit except as it consents to be sued. A.C. Chock, Ltd. v. Kaneshiro, 51 Hawaii 87, 451 P.2d 809 (1969); W.H. Greenwell, Ltd. v. Department of Land and Natural Resources, 50 Hawaii 207, 436 P.2d 527 (1968). The question of jurisdiction may be raised at any time. O'Daniel v. Inter-Island Resorts, Ltd., 46 Hawaii 197, 377 P.2d 609 (1962); Meyer v. Territory, 36 Hawaii 75 (1942).
Appellees urge this court to find a private right of action in damages directly from the State Constitution for alleged violations of certain of Michael's constitutional rights. Appellees would have us extend the rationale of Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which the United States Supreme Court held that a damage remedy could lie against federal officials who violate a plaintiff's constitutional rights so as to provide for liability for damages as against the State. This we cannot do. Just as the federal courts have refused to extend Bivens to provide for liability against a sovereign,[5] we are not free to abolish the State's sovereign immunity and the State remains immune from a Bivens-type claim.[6]
*1206 Further, Article XIV, Section 15 of the State Constitution[7] which provides that all its provisions are "self-executing to the fullest extent that their respective natures permit" does not constitute a waiver of sovereign immunity for money damages for constitutional deprivations. Appellees argue that with respect to claims involving constitutional provisions, in this case, the rights under both Constitutions to due process and freedom from cruel and unusual punishment, the self-executing clause makes available any and all accepted forms of redress including money damages. The argument does not persuade us. The self-executing clause only means that the rights therein established or recognized do not depend upon further legislative action in order to become operative. Student Government Association of Louisiana State University v. Board of Supervisors, 262 La. 849, 264 So.2d 916 (1972); Medina v. People, 154 Colo. 4, 387 P.2d 733 (1963); People v. Carroll, 3 N.Y.2d 686, 171 N.Y.S.2d 812, 148 N.E.2d 875 (1958). No case has construed the term "self-executing" as allowing money damages for constitutional violations. More importantly, in a suit against the state, there cannot be a right to money damages without a waiver of sovereign immunity and we regard as unsound the argument that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available.
A similar argument was made and rejected by the court in Gearin v. Marion County, 110 Or. 390, 223 P. 929 (1924). Gearin was an action against a city for damages resulting from its employees releasing a large quantity of logs, trees and stumps from the piers of a bridge to protect the same and causing the logs and debris to spread out over plaintiff's property, inflicting extensive damages to his buildings, property and land. A statute prohibited suits against counties. A provision in the Oregon Constitution provided that "every man shall have a remedy... for injury done him in his person, property or reputation." This provision, said the court, was "self-executing" but did not apply to an action sounding in tort brought against the state or county.
Moreover, we perceive nothing in Grant Construction Co. v. Burns, 92 Idaho 408, 443 P.2d 1005 (1968); Boxberger v. State Highway Department, 126 Colo. 138, 250 P.2d 1007 (1952); Angelle v. State, 212 La. 1069, 34 So.2d 321 (1948), and other cases centering on the Just Compensation clauses of various state constitutions that lend support to appellees. These cases are tied to the language, purpose and self-executing aspect of that particular provision. We must therefore determine whether the State Tort Liability Act confers a right to recover money damages for constitutional violations.
The State Tort Liability Act, enacted in 1957, is a specific waiver of tort immunity. HRS § 662-2 (1976) provides:
Waiver and liability of State. The State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances... .
We find no provision in the State Tort Liability Act that expressly makes the State liable in money damages for constitutional violations. To be sure, none of the exceptions set forth in HRS § 662-15 prohibit an individual from seeking compensation for deprivations of constitutional rights. In answer to this fact, appellees observe that since the Act is ambiguous, it should be liberally construed to allow for such suits. We did say in Rogers v. State, 51 Hawaii 293, 459 P.2d 378 (1969), that the State Tort Liability Act was modeled after the Federal Tort Claims Act and it should be liberally construed; however, this is only *1207 one rule of construction and is subservient to the cardinal rule of construction that the legislative intent must prevail. The State Tort Liability Act did not waive governmental immunity in all cases and the Act did not create any cause of action where none existed before. Smith v. Wait, 46 Ohio App.2d 281, 350 N.E.2d 431 (1975). The effect of the Act is to waive immunity from traditionally recognized common law causes of action in tort, other than those expressly excluded. It was not intended to visit the sovereign with novel liabilities. See Builders Corporation of America v. United States, 320 F.2d 425 (9th Cir.1963), cert. denied, 376 U.S. 906, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964); Smith v. Wait, supra.
The cases cited by appellees for the proposition that private persons can be held liable in damages for deprivations of constitutional rights were brought under various federal civil rights legislation which set forth the circumstances in which an arguably private actor is subject to the constitution and do not support appellees.
We therefore conclude that neither the State Constitution nor HRS Chapter 662 permits the claims set forth in appellees' second cause of action and thus the trial court was without jurisdiction over the subject matter; it should have been dismissed. Our holding makes it unnecessary for us to consider the additional arguments advanced by the State regarding the substantive constitutional rights.

IV
Appellees have filed a cross-appeal but we find no merit in the cross-appeal.
For the foregoing reasons, we vacate the judgment of the trial court; appellees' cross-appeal is dismissed; and this cause is remanded for further proceedings not inconsistent with this opinion.

MOTION FOR RECONSIDERATION
Per Curiam. In our opinion filed on December 31, 1979, we reversed the judgment entered by the court below and remanded for a new trial the first cause of action of the second amended complaint. The motion for reconsideration is denied without argument.
NOTES
[1] Appellee Michael Figueroa, who is the son of appellees Louis Figueroa and Shirley Pimental, will hereafter be designated by his first name, Michael.
[2] A jury trial is not authorized in an action against the State. HRS § 662-5 (1976).
[3] Appellees contended in the court below that appellant was negligent because Domingo did not have the key to the isolation cell with him and had to return to the staff office to recover the key; however, the court below did not find appellant negligent because of this factor or because of the method of resuscitation used by Domingo and Chang. Since this case is to be remanded this issue will be open for reconsideration.
[4] The court below stated in its Findings of Fact and Conclusions of Law in Conclusion of Law No. 6:

6. The defendant breached the duty of ordinary and reasonable care owed to plaintiff, Michael Figueroa, by the acts and omissions discussed previously in the FINDINGS OF FACT and which may be summarized as follows:
(a) Failure to adhere to the Corrections Division's and the Facility's rules and regulations concerning admissions and orientation, psychiatric and psychological programs, health programs, punishment procedures, isolation room procedures, Adjustment Committee procedures, the necessity for counseling, and acquainting inmates with grievance procedures.
(b) Failure to put forth any meaningful program to provide management, education, employment, or reformation, as mandated by HRS § 352 8 and to provide the diagnosis, counseling and therapeutic services necessary to implement these objectives.
(c) Failure to correctly adopt and clearly explain the voluminous rules and regulations of the Facility. Neither the staff nor the residents appear to have had sufficient knowledge of or to have comprehended the grievance procedures, punishment procedures nor the affirmative treatment procedures which were dictated by the rules of the institution.
(d) Failure to provide in-service training for the staff at Olomana Cottage especially with respect to the nature, implementation and effectiveness of the behavior modification program in effect at the Facility; how to recognize the signs and symptoms of depression and suicidal tendencies and when such symptoms merited referral to the psychiatric consultant; and how to deal with a ward who has threatened or attempted suicide or who has exhibited signs or symptoms of depression.
(e) Failure to protect or safeguard Michael from physical and mental abuse, harassment and bullying which the staff knew, or should have known he was receiving at the hands of the older residents.
(f) Failure to provide effective and accurate means of communication among staff members and to provide for adequate numbers of staff and adequate training in order to treat, safeguard and counsel Michael Figueroa.
[5] See, e.g., James v. United States, 358 F. Supp. 1381 (D.R.I. 1973) aff'd, 530 F.2d 962 (1st Cir.1976); Butler v. United States, 365 F. Supp. 1035 (D.Haw. 1973).
[6] The Federal Tort Claims Act was amended in 1974 so as to make the United States government liable for certain of the intentional torts of its investigative and law enforcement officers. Act of March 16, 1974, Pub.L. 93 253, § 2, 88 Stat. 50, amending 28 U.S.C. § 2680(h).
[7] Article XIV, Section 15 of the State Constitution is the provision referred by the court below in its Findings of Fact and Conclusions of Law filed on September 14, 1976. This provision reads the same as Article XVI, Section 16 in present State Constitution as amended in the election of November 7, 1978.