Jeff MAIZNER, Plaintiff,

v.

State of HAWAII, DEPARTMENT OF EDUCATION and Robert Ginlack, in his individual and official capacity, Defendants.

Civil No. 05–00552 SOM/KSC.

United States District Court,
D. Hawai'i.

Dec. 1, 2005.

Michael G.M. Ostendorp, argued, Honolulu, HI, for Plaintiff.

Ryan W. Roylo, argued, Office of the Attorney General–Hawaii, Honolulu, HI, for Defendants.

## ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

MOLLWAY, District Judge.

### I. INTRODUCTION.

In his First Amended Complaint, Plaintiff Jeff Maizner asserts claims against Defendants State of Hawaii, Department of Education ("the DOE"), and Robert Ginlack (collectively, "Defendants").[1] Maizner asserts: (1) a violation of the Americans with Disabilities Act ("the ADA") (Claim 1); (2) a violation of chapter 378 of Hawaii Revised Statutes (Claim 2); (3)

---

1. The First Amended Complaint named Ginlack in both his official and individual capacities. However, at the hearing on this motion, Maizner withdrew claims against Ginlack in his official capacity. Thus, Ginlack remains as a Defendant sued only in his individual capacity.

While the First Amended Complaint clearly names the DOE as a Defendant, it is unclear whether this action is also brought against the State of Hawaii as a separate Defendant. Regardless of which circumstance Maizner intends, the court refers in this order to the State and the DOE, collectively, as "the State."

negligent infliction of emotional distress (Claim 3); (4) negligent investigation (Claim 4); and (5) a violation of his due process and equal protection rights under the United States and Hawaii constitutions (Claim 5). Defendants move to dismiss the First Amended Complaint, and Maizner opposes that motion with some concessions.

Because the Eleventh Amendment immunizes the State from liability for retrospective relief, the court dismisses the claims asserting that the State violated the ADA and the federal Constitution, to the extent those claims seek retrospective relief. However, the court declines to dismiss those claims insofar as Maizner seeks prospective relief. Based on Eleventh Amendment immunity, the court dismisses in their entirety all of the state law claims asserted against the State.

The court construes the portion of Claim 5 that asserts a federal constitutional violation by Ginlack as brought under 42 U.S.C. § 1983; the court exercises jurisdiction over that claim. The court dismisses Claim 2 against Ginlack, asserted under chapter 378 of Hawaii Revised Statutes, but retains supplemental jurisdiction over the remaining state law claims against Ginlack.

## II. *LEGAL STANDARD.*

Defendants bring the present motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chandler v. McMinnville Sch. Dist.,* 978 F.2d 524, 527 (9th Cir.1992). The court must accept as true all allegations of material fact in the complaint and must construe these facts in the light most favorable to the plaintiff. *See Imagineering, Inc. v.*

*Kiewit Pac. Co.,* 976 F.2d 1303, 1306 (9th Cir.1992).

Because the State asserts Eleventh Amendment immunity, the court notes that there has been some confusion over whether Eleventh Amendment immunity is a component of this court's subject matter jurisdiction and so must be raised in a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure, rather than under Rule 12(b)(6). Appellate courts have issued seemingly conflicting statements on this point. The Supreme Court, for example, has stated that the "fact that the State appeared and offered defenses on the merits does not foreclose consideration of the Eleventh Amendment issue; 'the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar' that it may be raised at any point of the proceedings." *Fla. Dep't of State v. Treasure Salvors,* 458 U.S. 670, 683 n. 18, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) (quoting *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). The Ninth Circuit has similarly stated that "Eleventh Amendment sovereign immunity limits the jurisdiction of the federal courts and can be raised by a party at any time during judicial proceedings or by the court sua sponte." *Cal. Franchise Tax Bd. v. Jackson (In re Jackson),* 184 F.3d 1046, 1048 (9th Cir.1999); *see also Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.,* 810 F.2d 869, 873 n. 2 (9th Cir.1987).

Other appellate decisions, however, have noted that sovereign immunity may be waived. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *ITSI TV Prods., Inc. v. Agric. Assocs.,* 3 F.3d 1289, 1291–92 (9th Cir. 1993); *Hill v. Blind Indus. & Servs. of Md.,* 179 F.3d 754, 760, *as amended,* 201 F.3d 1186 (9th Cir.1999). Under this line

of cases, Eleventh Amendment immunity is treated as an affirmative defense that the defendant claiming immunity has the burden of demonstrating. *ITSI,* 3 F.3d at 1291–92.

The Ninth Circuit has attempted to reconcile these cases, calling states' Eleventh Amendment immunity "quasi-jurisdictional." *Arizona v. Bliemeister (In re Bliemeister),* 296 F.3d 858, 861 (9th Cir.2002). Under *Bliemeister,* sovereign immunity "may be forfeited where the state fails to assert it and therefore may be viewed as an affirmative defense." *Id.* In cases subsequent to *Bliemeister,* the Ninth Circuit has not expressly ruled on whether district courts should apply Rule 12(b)(1) or Rule 12(b)(6) of the Federal Rules of Civil Procedure to claims of Eleventh Amendment immunity. This court need not resolve whether to apply Rule 12(b)(1) or 12(b)(6) to the present motion, as both rules essentially apply the same standard under the circumstances of this case.

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be facial or factual. *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1973, 161 L.Ed.2d 856 (2005). In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. *Id.* By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. *Id.; see also Whisnant v. United States,* 400 F.3d 1177, 1179 (9th Cir. 2005) (noting that a party bringing a Rule 12(b)(1) motion may assert "that the allegations in the complaint are insufficient to establish subject matter jurisdiction as a matter of law" or "that the allegations on which jurisdiction depends are not true as a matter of fact" (citation omitted)). In resolving a facial attack, all allegations in

the complaint are taken as true. *Whisnant,* 400 F.3d at 1179. However, in resolving a factual attack, the court need not presume the truthfulness of the plaintiff's allegations. *Safe Air,* 373 F.3d at 1039.

Because the State's claim of immunity does not challenge the truth of Maizner's allegations, but asserts that they are insufficient on their face to invoke subject matter jurisdiction, the State's attack is facial. Accordingly, whether this court reviews the State's claim of sovereign immunity under Rule 12(b)(6) or 12(b)(1), this court must accept as true the allegations in the First Amended Complaint.

## III. BACKGROUND FACTS.

Maizner was hired by the DOE in December 2002 as a special education teacher at Mililani High School. Am. Complaint ¶ 10. Ginlack was the principal of Mililani High School "during the relevant time period," but was replaced by Dr. John Brummel at the start of the 2004–05 school year. *Id.* ¶¶ 6, 19.

Maizner says he suffers from rheumatoid arthritis, which causes difficulty with walking, performing manual tasks, and working. *Id.* ¶ 11. According to Maizner, he gave Ginlack three doctor's notes describing his disability on three different occasions, starting on or about April 21, 2003. *Id.* ¶ 12. Maizner says he asked Ginlack for reasonable accommodations at those times, including permission to wear flip flops when his feet swelled from the arthritis. *Id.* ¶¶ 12, 14. Maizner alleges that, although Ginlack refused his request to wear flip flops, Ginlack allowed nondisabled employees to wear that footwear to school. *Id.* ¶ 14.

According to the First Amended Complaint, Ginlack ignored Maizner's requests for accommodations and did not inform Maizner of the formal procedures for requesting accommodations. *Id.* ¶ 13. Ma-

izner says that Ginlack also failed to initiate an interactive process with Maizner to identify the precise limitations caused by his disability and failed to make a good faith effort to identify potential accommodations that could address those limitations. *Id.* ¶ 15. Maizner also alleges that Ginlack told other employees that he did not believe Maizner had arthritis or was otherwise disabled. *Id.* ¶ 17. Maizner says Ginlack's statements defamed and humiliated him. *Id.*

During the 2004 spring semester, Ginlack allegedly took Maizner away from his classroom duties and placed him in a small, windowless room to perform nonteaching administrative tasks. *Id.* ¶ 16. Maizner says that his new duties required him to sit for long periods of time, which aggravated his disability. *Id.* Additionally, Maizner alleges that Ginlack prohibited Maizner's students from contacting Maizner while he was performing the administrative duties. *Id.* ¶ 17.

Maizner says that Brummel replaced Ginlack as the principal of Mililani High School at the start of the 2004–05 school year. *Id.* ¶ 19. Maizner alleges that, unlike Ginlack, Brummel informed him of the formal procedures for requesting accommodations. *Id.*

Maizner alleges that, in late 2004 and early 2005, he requested accommodations from the DOE's Office of Civil Rights Compliance. *Id.* ¶ 20. In response, the DOE allegedly failed to initiate a good faith interactive process with him, to conduct an objective and thorough investigation, or to offer reasonable accommodations. *Id.*

Maizner alleges that, on January 20, 2005, Dr. Kristine Uramoto, his physician, sent a letter to the DOE, describing the nature of his disability and the resulting limitations. *Id.* ¶ 21. Maizner says that, even after receiving this letter, the DOE failed to conduct an objective, prompt, and thorough investigation of the doctor's report and did not initiate an interactive process with Maizner to explore possible accommodations. *Id.*

Maizner claims that, as a result of his repeated requests for accommodations, his relationships with his supervisors deteriorated, and he experienced stress. *Id.* ¶ 22. Maizner alleges that, during May 2005, he was diagnosed with work-related major depression, and his psychiatrist recommended that he refrain from working for at least six months. *Id.* ¶ 23. Maizner says he stopped working and filed a claim for workers' compensation on May 13, 2005. *Id.* Maizner alleges that the DOE should have filed an employer's report of injury no later than May 24, 2005, but did not do so until July 18, 2005. *Id.* ¶ 24.

According to Maizner, on June 22, 2005, while he was on leave from work, the DOE informed him by mail that he had been given an unsatisfactory rating pursuant to the Professional Evaluation Program for Teachers. *Id.* ¶ 25. Maizner alleges that, on August 31, 2005, while he was still on leave, the DOE informed him by mail that he had been terminated from his position as a teacher. *Id.* ¶ 26.

## IV. ANALYSIS.

### A. *Claims Against the State.*

The State argues that the Eleventh Amendment immunizes it from all claims in this case. Maizner concedes that the Eleventh Amendment shields the State from liability for money damages, but argues that the State may be sued for prospective injunctive relief under federal law. This court agrees with Maizner on this point.

The Eleventh Amendment to the United States Constitution provides:

The Judicial power of the United States shall not be construed to extend to any

suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Pursuant to the Eleventh Amendment, states cannot be sued in federal court by their own citizens or citizens of another state. *Papasan v. Allain*, 478 U.S. 265, 275, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The Eleventh Amendment also bars federal court actions against state agencies or instrumentalities. *Shaw v. State of Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 603 (9th Cir.1986). Unless a state unequivocally waives its sovereign immunity or Congress properly exercises its power to override that immunity, the state and its agencies are immune from suit under the Eleventh Amendment. *See Bd. of Trs. of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195 (9th Cir. 2005).

■ Where immunity has not been waived or overridden, the Eleventh Amendment immunizes states and state agencies from claims seeking retrospective relief. *See Ulaleo v. Paty*, 902 F.2d 1395, 1398 (9th Cir.1990) ("The eleventh amendment bars citizen suits against states, institutional arms of the state, and state officials in their official capacity when the relief sought is *retrospective* in nature, i.e. damages." (citations omitted)). However, the Eleventh Amendment does not bar claims for *prospective* declaratory or injunctive relief against states or state agencies. *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1511 (9th Cir.1994) ("The Eleventh Amendment does not prohibit a federal court from ordering prospective, as opposed to retroactive, relief.") (citing *Edelman*, 415 U.S. at 664–67, 94 S.Ct. 1347); *see also Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

■ With respect to claims based on state law, the Eleventh Amendment completely immunizes states and state agencies from state law claims brought in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 117, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (concluding that "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself"); *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973–74 (9th Cir.2004) ("[A]ll of [plaintiff's] state law claims are barred by the Eleventh Amendment, which precludes the adjudication of pendent state law claims against nonconsenting state defendants in federal courts." (citations omitted)), *cert. denied*, —— U.S. ——, 125 S.Ct. 1828, 161 L.Ed.2d 724 (2005); *see also Office of Hawaiian Affairs v. Dep't of Educ.*, 951 F.Supp. 1484, 1492 (D.Haw.1996) ("the Eleventh Amendment bars federal courts from exercising jurisdiction over state law claims against a state." (citing *Pennhurst*, 465 U.S. at 118–22, 104 S.Ct. 900)). In *Pennhurst*, the Supreme Court explained:

A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

465 U.S. at 106, 104 S.Ct. 900.

The DOE falls within the protection of the Eleventh Amendment, as it is a state agency. *See Office of Hawaiian Affairs*, 951 F.Supp. at 1492 (D.Haw.1996) (concluding that the DOE is a state agency

entitled to Eleventh Amendment immunity).

### 1. *Federal Law Claims.*

Only Claim 1 (asserting a violation of the ADA) and part of Claim 5 (asserting violations of the federal Constitution) are based on federal law. Congress has not validly abrogated the states' sovereign immunity from suit by private individuals under Title 1 of the ADA. *Garrett,* 531 U.S. at 374 n. 9, 121 S.Ct. 955. Nor has the Eleventh Amendment been nullified, either by congressional abrogation or the State's waiver, with respect to direct claims under the federal Due Process and Equal Protection Clauses. Thus, the State is immune from any retrospective relief relating to such claims. *See Native Village of Noatak,* 38 F.3d at 1511.

At the hearing on the instant motion, Maizner clarified that, with respect to claims against the State, he seeks only the following relief: (1) reinstatement; (2) an order requiring the State to initiate an interactive process with him to identify the precise limitations resulting from his disability and potential reasonable accommodations; and (3) ancillary attorneys' fees and costs. *See also* Am. Complaint at 17.

■ Reinstatement is prospective injunctive relief that escapes Eleventh Amendment immunity. *See Hibbs v. Dep't of Human Res.,* 273 F.3d 844, 871 (9th Cir.2001) ("reinstatement is the sort of prospective injunctive relief for which a state officer can be held liable" (citing *Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836, 839–42 (9th Cir.1997))), *aff'd,* 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). According to the Ninth Circuit:

[The plaintiff's] reinstatement would not serve as compensation for any past harm, unlike a damages award. Reinstatement would not compensate [the plaintiff] for lost wages or lost time working.... Rather, reinstatement would simply prevent the prospective violation of [the plaintiff's] rights which would result from denying him employment in the future. If [the plaintiff] were reinstated, any salary received by him thereafter would have nothing to do with the alleged past violation. [The plaintiff] would be entitled to such salary solely for his work after reinstatement. Thus, while reinstatement would relate to the past violation, it would not amount to relief *solely for the past violation.*

*Doe,* 131 F.3d at 841. Therefore, the Eleventh Amendment does not immunize the State from an order to reinstate Maizner.

If Maizner is reinstated as a teacher with the State and, at that time, continues to seek reasonable accommodations for his disability, the State would be under the "mandatory obligation to engage in an informal interactive process to clarify what [Maizner] needs and identify the appropriate accommodation." *See Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002) (citation omitted). Because Maizner previously notified the State of his disability and his desire for accommodations, the State's obligation to engage in an interactive process has already been triggered. *Id.* ("This interactive process is triggered upon notification of the disability and the desire for accommodation." (citation omitted)). Therefore, should Maizner be reinstated and continue to seek accommodations at that time, an order requiring the State to initiate such a process would simply prevent the prospective violation of Maizner's rights. *Cf. id.* ("reinstatement would simply prevent the prospective violation of [the plaintiff's] rights which would result from denying him employment in the future."). Because such an order "would not amount to relief solely for the past violation," an order requiring the State to initiate an interactive process with Maizner is prospective in nature. *Id.* (em-

phasis omitted); *see also Native Village of Noatak*, 38 F.3d at 1511–12 (characterizing prospective relief as "relief given in the future pursuant to an injunction"); *Ulaleo*, 902 F.2d at 1398–99 ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." (citation omitted)).

Maizner also seeks fees and costs ancillary to the foregoing prospective injunctive relief. The Supreme Court has noted that "it must be accepted as settled that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment." *Missouri v. Jenkins*, 491 U.S. 274, 279, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Accordingly, the Eleventh Amendment does not shield the State from paying fees and costs if Maizner is awarded reinstatement and an order requiring an interactive process.

Based on the foregoing, the court declines to dismiss Claim 1 and that portion of Claim 5 asserting a violation of the federal Constitution, as against the State, to the extent that Maizner seeks prospective relief.[2] However, any retrospective relief sought in relation to these federal law claims is dismissed.

### 2. *State Law Claims.*

■ As discussed above, the Eleventh Amendment "precludes the adjudication of pendent state law claims against nonconsenting state defendants in federal courts." *Cholla Ready Mix, Inc.*, 382 F.3d at 973–74 (citing *Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900). Because the State has not consented to be sued for the instant state claims in federal court, it is immune from such claims. *See Office of Hawaiian Affairs*, 951 F.Supp. at 1491–92, 1501 (noting that Haw.Rev.Stat. §§ 661–1 and 662, in which the State of Hawaii consents to being sued for violations of state statutes and tort actions, respectively, do not waive immunity to such claims in federal court and do not waive immunity for constitutional violations brought in federal court); *see also Doe ex rel. Doe v. State of Haw. Dep't of Educ.*, 351 F.Supp.2d 998, 1018 (D.Haw. 2004) ("Although the State of Hawaii generally waives ... sovereign immunity as to torts of its employees in the Hawaii State Tort Liability Act, H.R.S. ch. 662, this waiver only applies to claims brought in state courts and does not constitute a waiver of the State's Eleventh Amendment immunity." (citations omitted)); *Pahk v. Hawaii*, 109 F.Supp.2d 1262, 1268 (D.Haw. 2000) ("Although the State of Hawaii consents to being sued in tort actions[,] ... that consent applies only to cases brought in the state courts of Hawaii, not to cases brought in federal courts." (citation omitted)).

To the extent Maizner seeks relief against the State of any kind, including both retrospective and prospective injunctive relief, in Claim 2 (violation of chapter 378 of Hawaii Revised Statutes), Claim 3 (negligent infliction of emotional distress), Claim 4 (negligent investigation), and that portion of Claim 5 asserting a violation of the state constitution, those claims are dismissed.

### B. *Claims Against Ginlack.*

At the hearing, Maizner clarified that all claims in the First Amended Complaint, except Claim 1, are also asserted against Ginlack. Maizner additionally clarified that

---

**2.** The court's ruling addresses only the arguments raised by the present motion. The court is not here saying either that Maizner's federal claims are free of all defects or suffer from defects not identified in the motion.

he seeks only money damages from Ginlack for each claim.

Ginlack argues that Claim 2 (violation of chapter 378 of Hawaii Revised Statutes) must be dismissed because Haw.Rev.Stat. § 378–2 does not provide for individual liability. Motion at 10–11. Regarding Claim 5, Ginlack contends that Maizner may not bring an action for money damages directly under the federal and state constitutions. The remaining claims (Claims 3 and 4) are state law claims that Ginlack urges this court not to exercise supplemental jurisdiction over. The court dismisses Claim 2, has jurisdiction over the federal question asserted in Claim 5, and retains supplemental jurisdiction over the remaining state law claims against Ginlack.

1. *The Court Dismisses Claim 2 Against Ginlack, as Maizner States No Claim Under Chapter 378 of Hawaii Revised Statutes.*

In the First Amended Complaint, Maizner asserts that Ginlack "was during the relevant time period an employee and agent of [DOE] as Principal of Mililani High School." Am. Complaint ¶ 6. Nowhere does Maizner allege that Ginlack himself had any employees. Ginlack contends that chapter 378 "does not provide for individual liability." Motion at 10–11 (citing *Mukaida v. Hawaii*, 159 F.Supp.2d 1211, 1225–27 (D.Haw.2001)). Maizner argues, without citing any supporting legal authority, that "Ginlack is liable in his individual capacity for his retaliatory behavior under [Haw.Rev.Stat.] § 378–2(2)." Mem. Opp. at 10. Maizner made it clear at the hearing on the present motion that he is making no concession on this claim against Ginlack.

Section 378–2(2) makes it an unlawful discriminatory practice "[f]or any employer ... to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden in this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part." At the hearing on the present motion, Maizner added Haw.Rev.Stat. § 378–2(3) as yet another basis for Claim 2. Section 378–2(3) makes it an unlawful discriminatory practice "[f]or any person, whether an employee, employer, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so." Because claims against Ginlack under either section are not cognizable, the court dismisses Claim 2 as against Ginlack in his individual capacity.

The judges in this district are divided as to whether a plaintiff may sue an individual employee in the same manner as the plaintiff sues an employer under Haw.Rev. Stat. § 378–2. This is a recurring state law question on which the judges of this court have no explicit ruling from a state appellate court. While recognizing her differences with some of her colleagues, this judge has not been asked to and declines to *sua sponte* certify the matter to the Hawaii Supreme Court.

A review of how the judges of this district have treated the issue may be useful. This review discusses only published decisions, although there are also unpublished decisions addressing the issue. In *Black v. City & County of Honolulu*, 112 F.Supp.2d 1041, 1056–57 (D.Haw.2000), Judge Samuel King held that individual employees could be sued under section 378–2. *Black* appears to have been examining claims under section 378–2(1) or section 378–2(2), both of which concern an employer's liability. Judge King reasoned that *Steinberg v. Hoshijo*, 88 Hawai'i 10, 18 n. 10, 960 P.2d 1218, 1226 n. 10 (1998), included "a strong indication that the Hawaii Supreme Court would interpret [chap-

ter 378] to hold individual employees liable if the issue were put before it." *Black,* 112 F.Supp.2d at 1057. In *Mukaida v. Hawaii,* 159 F.Supp.2d 1211, 1226 (D.Haw. 2001), this judge disagreed, noting that the language of the portions of section 378–2 in issue made it unlawful for "any employer" to discriminate. This judge said that, in *Steinberg,* the parties had not disputed that the individual defendant was an employer and therefore the Hawaii Supreme Court had not been required to and did not actually decide that issue.[3]

After deciding *Mukaida,* this judge issued an order in *Luzon v. Atlas Ins. Agency, Inc.,* 284 F.Supp.2d 1261, 1265–66 (D.Haw.2003), which discussed a Hawaii Supreme Court decision, *Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 32 P.2d 52 (2001), that had been decided after *Mukaida.* This judge noted that *Schefke* had permitted claims against individual employees to proceed but that, once again, it did not appear there had been a dispute as to whether state law allowed that. The individual employees also happened to be owners of the closely held corporate defendant. Most critical to this judge was the reliance by the plaintiff on Haw.Rev.Stat. § 378–2(3) as the basis of at least some of the claims. Unlike several other parts of section 378–2, section 378–2(3) expressly allows claims against "any person, whether an employee, employer, or not" who acts to "aid, abet, incite, compel, or coerce" discriminatory practices.

Chief Judge David Ezra agreed with the reasoning of *Luzon* in *White v. Pacific Media Group,* 322 F.Supp.2d 1101 (D.Haw. 2004). Thereafter, Judge J. Michael Seabright disagreed with the reasoning of *Mukaida, Luzon,* and *White.* In *Sherez v. Department of Education,* 396 F.Supp.2d 1138 (D.Haw.2005), he held:

> HRS § 378–2 thus makes it unlawful for an "employer" to engage in certain acts of discrimination. HRS § 378–1 broadly defines "an employer" as "any person ... having one or more 'employees'" and "including any agent of such person." Provided that a person employs one or more employees, the definition includes "any agent" of that person. A plain reading of the statute strongly suggests that an individual agent can be held liable as an employer for purposes of § 378–2.

*Id.* at 1146 (footnote omitted).

In accordance with the position she took in *Mukaida* and *Luzon,* this judge maintains that section 378–2(2) does not permit claims against individual employees. That section governs claims only against "employers," labor organizations, and employment agencies. The term "employer" is defined in section 378–1:

> "Employer" means any person, including the State or any of its political subdivisions and any agent of such person, having one of more employees, but shall not include the United States.

**3.** Similarly, in *Sam Teague, Ltd. v. Hawaii Civil Rights Commission,* 89 Hawai'i 269, 971 P.2d 1104 (1999), the Hawaii Supreme Court recognized that the Hawaii Civil Rights Commission had allowed a claim against an individual on the ground that the individual was acting as an agent of a person having one or more employees, and that the individual therefore fit within the definition of "employer." However, the Hawaii Supreme Court did not appear to have been faced with any question on appeal as to whether such a claim was cognizable. Instead, the issue before the court had to do with whether the claim had been timely asserted. The court appears to have accepted the Commission's position for purposes of deciding the limitation issue. The individual employee who was a defendant happened to be the president and sole stockholder of a two-person business, which may have affected the Commission's treatment of the individual as an employer.

### a. The "Having" Phrase is Restrictive.

In *Sherez,* the two modifying phrases ("including the State or any of its political subdivisions and any agent of such person" and "having one or more employees") are given equal status. Thus, *Sherez* says that, under section 378–1, "an employer" is "broadly defined" as "any person ... having one or more 'employees' and 'including any agent of such person.'" But just because the two phrases may be connected by the simple word "and" does not mean that they are equally important qualifiers of the words "any person." The "having" phrase and the "including" phrase have different grammatical functions, and that difference governs the meaning of the statute.

"Having one or more employees" modifies "any person" by restricting the type of "person" that is an "employer." Only a person having one or more employees is an employer. As a grammatical element, this participial phrase plays the same role as a restrictive clause. Thus, "any person having one or more employees" could be restated as "any person that [or who] has one or more employees." "Any person having one or more employees," as used in section 378–1, could not be correctly restated with a nonrestrictive clause. The distinction is cogently summarized as follows:

> Restrictive clauses are relative clauses "delimiting the meaning or reference of a modified noun phrase or other element." ... Leech and Svartvik (1975) cite the following pair of sentences to bring out the distinction: [1] *Children who learn easily should start school as early as possible;* [2] *Children, who learn easily, should start school as early as possible.* In [1] the relative clause is restrictive and tells us *what kind of* children ought to start school early. In [2], where the relative clause is non-

> restrictive, the speaker is talking about all children in general. ... The clause does not in any way limit the reference of *children.*

H.W. Fowler, *The New Fowler's Modern English Usage* 672 (R.W. Burchfield rev.3d ed.1998).

### b. The "Including" Phrase Only Lists Examples.

By contrast to the "having" phrase, the "including" phrase functions like a nonrestrictive clause. That is, "any person, including the State or any of its political subdivisions and any agent of such person" may be restated as "any person, which includes the State or any of its political subdivisions and any agent of such person." The "including" words simply list examples. These examples are not examples of "any person." Rather, because "having one or more employees" is a restricting modifier, "any person" must have as a necessary appendage the words "having one or more employees." Thus, "including" introduces examples of "any person having one or more employees." Given the different functions of the phrases, the definition of "employer" would be the same no matter where one put the phrases. Thus, without changing the meaning of "employer," the drafters could have placed the "having" phrase right next to "any person," so that the definition read, " 'Employer' means any person having one or more employees, including the State or any or its political subdivisions and any agent of such person, but shall not include the United States." This would have placed the examples of those included in the definition ("the State or any of its political subdivisions and any agent of such person") right next to what was excluded ("the United States").

If the reference to "any agent of such person" in the "including" clause is read as being independent of the "having one or

more employees" restrictive language, the "having" clause is denied its restrictive nature. This reading also changes the definition of "including." If section 378–1 is read as saying that any individual agent is an employer, even if that agent has no employees, then "including" takes on the meaning of "in addition to." Section 378–1 would then have to be read as defining "employer" so that the term included any person having one or more employees (such as the State or any of its subdivisions, but not the United States) as well as an individual agent of a person having one or more employees.

While "including" is sometimes used to mean "as well as," that is typically in a different grammatical context. *See* Fowler, *supra*, at 387 (discussing the use of "including" followed by a prepositional phrase, as in "including by reputable authors"). As it appears in section 378–1, "including" introduces examples, not alternatives or additions. Thus, the State is an example of a person with one or more employees, as is a political subdivision of the State. It makes no sense to treat "including" as introducing examples of "any person having one or more employees" with respect to "the State or any of its political subdivisions," but then to treat "including" as introducing an example of something in addition to "any person having one or more employees" with respect to "any agent of such person." "Including" must be read consistently with respect to everything it introduces, and "any agent of such person" must be read as parallel to "the State" and to "any of its political subdivisions."

The meaning of "employer" is thrown into relief when other words are substituted for those in section 378–1 but the same grammatical structure is retained. Take the following sentence: "The postal service accepts any addressed item, including a letter or a package, having sufficient post-age." No matter what, the postal service requires sufficient postage. The postal service does not accept all packages without regard to whether they bear postage. Thus, as in section 378–1, all examples in the "including" phrase are subject to the restriction in the "having" phrase. One could also examine the sentence, "An 'honor roll student' means any person, including a freshman or a sophomore or a junior or a senior, having a B+ average." A senior without a B+ average would not be an honor roll student. Once again, the items in the "including" phrase are subject to the restriction in the "having" phrase.

c. *The Agency Reference Does Not Change the Grammatical Structure of the Definition of "Employer."*

Section 378–1 introduces a slight complication when, in defining "employer" as "any person having one or more employees," it includes "any agent of such person." That reference back to "such person" has generated much previous discussion. *Mukaida* reads the reference to an agency relationship as imposing respondeat superior liability on employers for their agents' acts, not as inviting claims against individual employees. 159 F.Supp.2d at 1227. This reading is consistent with the Ninth Circuit's reading of an analogous term in Title VII's definition of "employer." Under Title VII, an "employer" is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." *See* 42 U.S.C. § 2000e–2. According to the Ninth Circuit, the purpose of the agency reference in that definition was to incorporate respondeat superior liability into Title VII, not to create liability for

individual employees. *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir.1993). *See generally Mukaida*, 159 F.Supp.2d at 1224 n. 10, 1226–27 (discussing the meaning of the "agent" reference).

While the meaning of the reference in section 378–1 to "any agent of such person" is less than obvious, the reference has no impact on the grammatical structure of the sentence. Again, changing the words but retaining the grammatical structure clarifies the matter. Consider the following sentence: "The court's order seals any document, including an original or a copy or a summary of such document, having classified information." Suppose a particular summary of a classified document contained no classified information. That summary, consisting entirely of unclassified information, would not be covered by the court order. All the items in the "including" phrase, even the "summary of such document," are subject to the restriction in the "having" phrase.

d. *The Present Reading of Section 378–2(2) Is Consistent with Legislative Intent.*

*Sherez* seeks to reconcile the policies underlying section 378–2(2), which makes it unlawful for an employer to engage in certain discriminatory conduct, with the policies underlying section 378–2(3), which makes individual employees liable if they aid, abet, incite, compel, or coerce discrimination. *Sherez* notes, "It is hard to imagine that the Hawaii legislature meant to impose liability on small employers and on individuals who aid and abet discrimination, yet at the same time meant to immunize the individual agents who actually engage in unlawful discrimination." 396 F.Supp.2d at 1147.

But this judge's reading of section 378–2(2) does not actually "immunize" individual employees; section 378–2(2) simply does not extend to them. Individual employees remain liable for wrongdoing under other laws that they may have violated. Thus, for example, individuals may be liable for race discrimination under 42 U.S.C. § 1981 even if they are not employers. An individual employee who assaults another employee based on the victim's sex may face an intentional tort claim.

Section 378–2(3), by contrast, extends aider and abettor liability to individual employees in the same way that it extends such liability to persons outside of the employee-employer relationship. The legislature could legitimately decide to reserve certain laws for certain relationships, while viewing other laws as properly extending beyond those relationships. After all, the legislature had to realize that if it drafted section 378–2 to allow employees to freely sue each other for employment discrimination, that might not necessarily be employee-friendly. For every plaintiff employee benefitting from such a provision, there would be a corresponding defendant employee, and at least one employee in each such dispute would be at risk of losing.

There is nothing illogical about a legislative decision to address systemic discrimination by passing employment discrimination laws, but not to seek to use those laws to curb individual employees who may be renegades acting badly without an employer's backing. An employer has power over an employee, and two or more individuals may similarly enjoy power over a single employee. As aiding or abetting discrimination requires at least two actors, it may present something akin to the systemic imbalance of power that the legislature may have been concerned with in the relationship between employer and employee. That may be the reason that the legislature, having demonstrated an ability to clearly allow suits against individuals in

the aiding and abetting language of section 378–2(3), refrained from including individual employees within the scope of section 378–2(2). A single employee acting without the backing of the employer does not necessarily call into play the imbalance of power inherent between an employer and employee or between several individuals and a single individual. Certainly, a single employee may be in a supervisory position or otherwise have power over another employee, but to read section 378–2(2) as allowing claims against any individual employee would mean that the law did not require an imbalance of power.

Finally, *Sherez* takes the position that individual employee liability under section 378–2(2) is consistent with chapter 378's application to employers with one or more employees, in contrast to Title VII's application to employers with fifteen or more employees. But chapter 378's broad application even to small employers could be said to make individual employee liability an even less necessary remedy than is the case with Title VII.

The legislative history of chapter 378 provides some (admittedly oblique) corroboration of this court's reading of section 378–2(2). At one time, section 378–1 defined "employer" without mentioning the State. Employer was defined as "any person having one or more persons in his employment, and includes any person acting as an agent of an employer, directly or indirectly." Haw.Rev.Stat. § 378–1(4) (1976). The definition was later amended to include the State, thereby waiving the State's immunity.[4] In adding that reference, the legislature said:

> Currently, the State and county governments as employers are not expressly subject to Chapter 378, HRS, which prohibits discriminatory employment practices. In enacting the law in 1963,

the intent of the Legislature, as stated in the relevant committee reports, was to exclude the State and its political subdivisions from the definition of "employer" and instead to provide government workers with protection against employment discrimination under a separate law. However, such a law has not yet been enacted. As a result, an aggrieved State or county employee must file a complaint under Title VII of the federal Civil Rights Act of 1964, as amended, with the Equal Employment Opportunity Commission (EEO), San Francisco District Office, and must then await an investigation which, until recently, often took about two years.

> This bill remedies this inequity by providing the same protection against discrimination under State law (Chapter 378, HRS), to public employees as it already provided to employees in the private sector.

H. Stand. Comm. Rep. No. 549, 11th Leg., Reg. Sess, *reprinted in* 1981 House Journal 1166; *see also* S. Stand. Comm. Rep. No. 653, 11th Leg., Reg. Sess., *reprinted in* 1981 Senate Journal 1195.

If the legislature had intended to permit suits against individual employees who were agents of employers, then the legislature would have had no reason to say, in 1981, that State and county employees had no recourse but to file complaints with the Equal Employment Commission. State and county employees in that event could have filed claims directly against offending individual employees under chapter 378. The legislature's view of the remedies available to State and county employees suggests that the legislature was not envisioning claims against individual employees.

Considerable discussion remains to take place about this issue at the state and

---

4. Of course, this waiver of immunity did not waive Eleventh Amendment protections. Instead, it allowed suits against the State in state courts.

federal appellate level and within this district. At some point, a state appellate court will provide a definitive opinion on the definition of "employer." In the meantime, this judge submits that earlier opinions by the Hawaii Supreme Court that refer to this issue have not actually decided it. Based on the plain language of sections 378–1 and 378–2(2), this court concludes that Maizner may not proceed under section 378–2(2) against Ginlack. In accordance with the discussion above and with *Mukaida* and *Luzon,* Maizner's claims under section 378–2(2) against Ginlack are dismissed.

### e. *Maizner States No Claim Under Section 378–2(3).*

■ That leaves Maizner's claims under section 378–2(3) against Ginlack in his individual capacity. Section 378–2(3) expressly allows claims against individuals who are not employers if the individuals "aid, incite, compel, or coerce" discrimination. At the hearing on the present motion, Maizner said that he was not claiming that Ginlack had aided or abetted another person in discriminating. Maizner said he was only claiming that Ginlack had incited, compelled, or coerced the doing of prohibited discriminatory practices. When this court inquired as to the identity of the person that Ginlack had incited, compelled, or coerced to discriminate, Maizner replied that Ginlack had incited, compelled, or coerced Ginlack himself into discriminating. This makes no sense to this court. Section 378–2(3) concerns the inciting, compelling, or coercing of one person by another person. There must be at least two persons (someone who incites, compels, or coerces, and some other person who is incited, compelled, or coerced).

Maizner's position would eliminate the very meaning of the verbs in the statute. The court is unaware of any split among the judges of this district on this point. Maizner states no claim under section 378–2(3).

### 2. *Claim 5, Broadly Read, States a § 1983 Claim Against Ginlack for Alleged Violations of the Federal Constitution, As Well As a State Constitutional Claim.*

■ In Claim 5, Maizner sues for federal and state constitutional violations. The motion to dismiss states that "an individual may not bring [an] action for money damages based on an intentional wrong or negligence directly under the U.S. Constitution. The same is true under Hawaii's Constitution." Motion at 7. In response, Maizner said in his opposition memorandum that he "agrees" that a party may not be sued under the constitutions for money damages. *See* Mem. Opp. at 12–13. However, perhaps because the motion did not distinguish claims against the State from claims against Ginlack individually, Maizner's opposition memorandum appears to have made a concession without expressly making that distinction. The context of Maizner's concession suggests that Maizner was conceding the point only with respect to claims against the State, which he agrees is immune from damage claims but maintains may be sued directly for injunctive relief, as discussed above. At the hearing on the present motion, he asserted the right to allege constitutional violations against Ginlack individually under the vehicle of 42 U.S.C. § 1983; he contended that the portions of Claim 5 seeking money damages from Ginlack should be read as including § 1983 allegations.[5]

---

**5.** Section 1983 provides, in relevant part:

[E]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the Dis-

trict of Columbia, subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Consti-

A prevailing plaintiff in a § 1983 action may recover money damages from an individual for a violation of the United States Constitution. *See* 42 U.S.C. § 1983; *cf. Dang v. Cross,* 422 F.3d 800, 806 (9th Cir.2005) ("the common law of torts governs the recoverable damages for liability under § 1983." (citation omitted)); *Cummings v. Connell,* 402 F.3d 936, 942 (9th Cir.2005) ("Under § 1983, damages for violations of constitutional rights are determined according to principles derived from the common law of torts." (citations omitted)). On this motion to dismiss, this court gives a liberal reading to the portion of Claim 5 asserted against Ginlack and concludes that a reference to § 1983 is implicit. The court therefore determines that Maizner's federal constitutional claim is not asserted only directly, and, for that reason, denies the motion to dismiss to the extent it argues that such claim may not be asserted directly under the federal Constitution. This ruling is without prejudice to the raising of other possible pleading defects in Claim 5, given Maizner's oral assertion that it contains a § 1983 claim against Ginlack.

■ The court turns to the portion of Claim 5 asserting violations by Ginlack of the state constitution. State constitutional claims are not covered by § 1983. *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 371 (9th Cir.1998) ("state law violations do not, on their own, give rise to liability under § 1983" (citation omitted)); *Lovell v. Poway Unified Sch. Dist.,* 90 F.3d 367, 370 (9th Cir.1996) ("Section 1983 limits a federal court's analysis to the deprivation of rights secured by the federal 'Constitution and laws.'" (citing 42 U.S.C. § 1983)). Therefore, even when the court reads Claim 5 liberally to include an implied § 1983 claim, Maizner is still bringing his state constitutional claim directly under the state constitution.

Ginlack relies solely on *Figueroa v. State,* 61 Haw. 369, 604 P.2d 1198 (1979), *as amended,* (1980), in maintaining that Maizner may not bring this action for money damages directly under the state constitution. Motion at 7. However, *Figueroa* did not decide that issue. *See Makanui v. Dep't of Educ.,* 6 Haw.App. 397, 403 n. 2, 721 P.2d 165, 170 n. 2 (Ct.App.1986) ("We do not decide whether Hawaii recognizes a cause of action for damages for deprivation of rights under the state's constitution or laws. *Figueroa v. State,* 61 Haw. 369, 604 P.2d 1198 (1979), did not decide this issue."). Because Ginlack points to no other legal authority on this issue, he does not meet his burden as the movant of demonstrating that Maizner's claim under the state constitution fails. The court need not and does not here decide the substantive issue of whether Maizner's direct claim under the state constitution is cognizable. The court's ruling is restricted to the conclusion that Ginlack's motion does not contain a basis for dismissal of that direct claim. If such a basis could indeed be articulated, then that remains to be done. The court will not fashion such an argument for any party and instead exercises supplemental jurisdiction over the state constitutional claim against Ginlack.

3. *The Court Retains Supplemental Jurisdiction Over Maizner's Remaining State Law Claims Against Ginlack.*

■ Defendants argue that this court should decline to exercise supplemental jurisdiction over all state law claims because the federal claims should be dismissed in their entirety. Motion at 7–8. Because

---

tution and laws, shall be liable to the party in an action at law, suit in equity or other proper proceeding to redress.

42 U.S.C. § 1983.

federal claims remain before this court, and because there is a common nucleus of operative fact between those claims and the remaining state claims, the court retains jurisdiction over the state law claims asserted against Ginlack in Claims 3 and 4.

Supplemental jurisdiction over state claims exists when a federal claim is sufficiently substantial to confer federal jurisdiction and there is "a common nucleus of operative fact between the state and federal claims." *Brady v. Brown,* 51 F.3d 810, 816 (9th Cir.1995) (citing *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 421 (9th Cir. 1991)). When a state law claim arises from a common nucleus of operative fact with a sufficiently substantial federal claim, a district court may nevertheless decline to exercise supplemental jurisdiction over a state law claim if: (1) the claim raises a novel or complex issue of state law; (2) the state law claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367. Supplemental jurisdiction is a doctrine of discretion, not of a plaintiff's right. *City of Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

As detailed above, a claim against Ginlack based on federal law remains before this court, in the form of the § 1983 claim in Claim 5. The remaining state law claims against Ginlack, *i.e.,* Claim 3 (negligent infliction of emotional distress) and Claim 4 (negligent investigation), like the state constitutional claim in Claim 5, discussed above, arise out of the same facts and circumstances as the federal claim. Neither party contends that the state claims raise novel or complex issues of state law or that the state claims substantially predominate over the federal claim. Finding no other compelling reason for declining supplemental jurisdiction, the court retains jurisdiction over the remaining state law claims.

## V. CONCLUSION.

With respect to claims against the State, the court dismisses Claim 1 and that portion of Claim 5 based on the United States Constitution to the extent they seek retrospective relief. However, such claims are not dismissed to the extent they seek prospective relief for reinstatement, an order requiring the State to initiate an interactive process should Maizner be reinstated and continue to seek accommodations, and related fees and costs. The court dismisses the state law claims against the State (Claims 2, 3, and 4, and the portion of Claim 5 that is based on the state constitution) in their entirety.

With respect to claims against Ginlack, the court dismisses Claim 2. However, the court has jurisdiction over the federal claim against Ginlack in Claim 5 and retains supplemental jurisdiction over Claims 3 and 4 as against Ginlack, as well as over that portion of Claim 5 asserting that Ginlack violated the state constitution.

In summary, this order leaves for further adjudication: (a) Claim 1 (asserting ADA violations) for prospective relief against the State; (b) Claim 3 (asserting negligent infliction of emotional distress) against Ginlack; (c) Claim 4 (asserting negligent investigation) against Ginlack; and (d) Claim 5 (asserting federal and state constitutional violations) for prospective relief under the federal Constitution against the State and for money damages

under 42 U.S.C. § 1983 and the state constitution against Ginlack.

IT IS SO ORDERED.