**Electronically Filed
Supreme Court
SCWC-23-0000694
05-JUN-2026
11:29 AM
Dkt. 22 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

ANTHONY BELLAMY,
Respondent/Plaintiff-Appellant,

vs.

CITY AND COUNTY OF HONOLULU; and
NICKOLAS T. HIRATA, Officer #1; DYLAN TORRES, Officer #2;
BYRON MARFIL, Officer #3; and DIANA A.P. MIRANDA, Officer #4;
in their individual capacities as Honolulu police officers,
Petitioners/Defendants-Appellees.

SCWC-23-0000694

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-23-0000694; CASE NO. 1CCV-21-0001403)

JUNE 5, 2026

DEVENS, C.J., McKENNA, EDDINS, AND GINOZA, JJ.,
AND CIRCUIT JUDGE NICHOLS, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY DEVENS, C.J.

## I.   INTRODUCTION

Respondent/Plaintiff-Appellant Anthony Bellamy (Bellamy)

sued the City and County of Honolulu (City) and Honolulu Police

Department officers Nickolas T. Hirata (Officer Hirata), Dylan

Torres (Officer Torres), Byron Marfil (Corporal Marfil), and Diana A.P. Miranda (Officer Miranda) (together, HPD; together with the City, Petitioners) for torts claimed to have been committed while the officers were investigating and responding to a 911 call (911 Call) of a reported gunshot in the Waikīkī apartment building where Bellamy resided. Bellamy alleged negligence, assault by threatening, invasion of privacy, intentional and negligent infliction of emotional distress (IIED and NIED, respectively), and improper search and seizure.

The question raised on certiorari is whether the Circuit Court of the First Circuit (circuit court) properly granted summary judgment in favor of Petitioners. The Intermediate Court of Appeals (ICA) vacated, in part, the circuit court's grant of summary judgment after finding that Bellamy's declaration created genuine issues of material fact as to Petitioners' tort liability.[1] We respectfully disagree with the ICA's decision.

Petitioners' summary judgment motion was supported by video and audio files from the officers' body-worn cameras and a recording of the 911 Call. HPD's body-worn cameras continuously recorded the encounter, capturing Officer Hirata's initial knock

---

[1]     The ICA affirmed the circuit court's dismissal of Bellamy's punitive damages claim against Petitioners.

on Bellamy's apartment door through the end of the interaction when the officers exited Bellamy's apartment. Notably, Bellamy did not raise any issues with respect to the authenticity, accuracy, or clarity of the video evidence, nor did he assert the recordings were ambiguous, incomplete, or altered in any way. In fact, Bellamy argued that the evidence "corroborated" his allegations.

The ICA relied on our decision in Nozawa v. Operating Engineers Local Union No. 3, 142 Hawaiʻi 331, 339, 418 P.3d 1187, 1195 (2018), where we held that statements in an affidavit need not be corroborated to raise a genuine issue of material fact. While this legal principle remains true and should not be disturbed, Nozawa is distinguishable from the case at bar because here, the issue is not that Bellamy's declaration was not corroborated. Rather, the issue is that Bellamy's material allegations had no competent evidentiary basis in light of the undisputed, unambiguous video evidence presented, and "[t]he court is permitted to draw only those inferences of which the evidence is reasonably susceptible[.]" Kaʻupulehu Land LLC v. Heirs and Assigns of Pahukula, 136 Hawaiʻi 123, 132, 358 P.3d 692, 701 (2015) (citing Winfrey v. GGP Ala Moana LLC, 130 Hawaiʻi 262, 270-71, 308 P.3d 891, 899-900 (2013)). That is, the evidence was not "reasonably susceptible" of any material

3

inferences in Bellamy's favor that would have established a genuine issue of material fact.

Bellamy's failure to raise a genuine issue of material fact warranted summary judgment for Petitioners. Thus, the circuit court properly granted summary judgment on this record.

## II. BACKGROUND

### A. Bellamy's Claims

Bellamy's amended complaint alleged that on May 8, 2021, HPD "knocked on his apartment door with rifle and guns drawn at approximately 3:00 a.m.–3:40 a.m. in the morning." He further alleged that the officers "burst in and pointed a rifle and gun and their flashlights at him yelling to keep his hands up and yelled 'where is the gun.' [Bellamy] did not give permission to [HPD] to enter his apartment or hold their rifle and guns at him." Bellamy claimed that "[o]ne officer shouted several times in a rough, aggressive, and threatening manner 'to keep his hands up' while another officer entered and searched his apartment with his flashlight." Bellamy further alleged that "[t]here was no warrant, exigent circumstances, [or] probable cause of reasonable suspicion to point a rifle and guns at [him][.]"

As stated, Bellamy asserted various tort claims and prayed for general, special, and punitive damages against Petitioners.[2]

## B.    Petitioners' Motion for Summary Judgment

Petitioners filed a motion for summary judgment (MSJ) on all of Bellamy's claims.[3]  We summarize the parties' salient evidence and summary judgment arguments.

### 1.    Petitioners' Evidence

In support of their MSJ, Petitioners submitted an audio recording of the 911 Call, a declaration from each defendant police officer, and video with audio from each officer's body-worn camera.

The 911 Call occurred on May 8, 2021, at 3:16 a.m.  The 911 caller, who lived above Bellamy's unit, told the 911 dispatcher, "I heard a really loud gunshot sound, it was just a single one and I could smell gunpowder. . . .  Um, I'm not sure it sounded somewhat muffled, and it sounded like it came underneath me, honestly."

---

[2]    Bellamy appears to have alleged invasion of privacy and improper search and seizure as private rights of action under article I, sections 6 and 7 of the Hawaiʻi Constitution.  Notwithstanding the issue of whether private rights of action for monetary damages exist under those provisions, see Figueroa v. State, 61 Haw. 369, 381–82, 604 P.2d 1198, 1205 (1979) (declining to find a private right of action for damages arising from the state constitution for alleged constitutional violations), Bellamy's arguments pertaining to these claims appear to correspond with the elements of the common-law tort theory of intrusion upon seclusion.  See Restatement (Second) of Torts § 652B (A.L.I. 1977).

[3]    The Honorable Kevin T. Morikone presided.

Corporal Marfil activated his body-worn camera at 3:21 a.m. as he was driving to the 911 caller's apartment building; his camera was turned off at 3:36 a.m., after the officers departed Bellamy's apartment unit.

Corporal Marfil, along with Officers Torres and Miranda, arrived at the apartment building located on Ala Wai Boulevard and went to Unit 2501, where the 911 caller lived. The unit directly below, Unit 2401, was where Bellamy resided.[4] The body-worn camera video showed the officers questioning the 911 caller, who confirmed that she heard the sound coming from beneath her unit and smelled gunpowder. The 911 caller also explained that she was enlisted in the military, and the scent was reminiscent of the "carbon you use to clean guns."

The officers asked several questions to confirm the 911 caller's perceptions, including whether the noise could have been from a vehicle backfiring on Ala Wai Boulevard. The caller expressed skepticism as to whether the noise came from a backfire, reiterating that she heard the noise coming from the interior of the building and not from her window facing Ala Wai Boulevard.

---

[4] The record contains no evidence suggesting that HPD knew who occupied Unit 2401 before Bellamy answered the door that night.

The video evidence further showed that the officers asked the 911 caller to let Officer Hirata into the building, which she did. Officer Hirata met the other officers in the hallway on the 25th floor at 3:33 a.m. An AR-15 rifle was slung on his shoulder by its shoulder strap. Corporal Marfil told Officer Hirata that they were going to check Unit 2401 downstairs.

Corporal Marfil and Officer Hirata walked to the 25th floor elevator lobby, where Corporal Marfil, referring to Officer Hirata's rifle, said, "Whoo, 's a nice one. Which one is that, what model is that?" Upon arriving at the elevator lobby, Officers Torres and Miranda also admired Officer Hirata's rifle. Corporal Marfil then said, "Locked and loaded, brah." There was no evidence presented that suggested Bellamy was privy to any of these comments made by the police officers before they knocked on his apartment door.

The body-worn camera video continued and showed the officers arriving at Bellamy's apartment (Unit 2401) at 3:34:52 a.m. Officer Hirata knocked on the door and announced, "Hello, police, can you just talk to us please." Corporal Marfil also announced, "HPD Police. Checking if everything okay." Officer Hirata held his rifle in the "low ready" position with the stock near his shoulder and the barrel pointed at the ground to the

left of Bellamy's doorway threshold.[5]  Officers Torres and Miranda and Corporal Marfil were farther behind with their weapons holstered.

Officer Hirata's declaration stated that Bellamy "opened the door with one hand and kept the other out of sight."  The videos showed Bellamy cracking the door open and waving a hand and stating, "Hey, what's up?"  Bellamy was asked twice by Officer Hirata, "Can I see your other hand, please."  Bellamy showed that his other hand was empty.  Officer Hirata then adjusted his rifle from the low ready position by allowing his rifle to hang from its strap on his shoulder with the barrel facing the ground.

With his rifle hanging and pointed downward, Officer Hirata explained the 911 Call and asked if Bellamy heard anything. Bellamy responded, "You can come check everything in here, there's nothing in here," and then opened his door for the officers.

Officers Hirata and Torres entered Unit 2401 at 3:35:52 a.m. and looked around the living room with flashlights.  After visually inspecting the living room, Officer Hirata asked

---

[5]    The ICA characterized this firearm position as "low ready."  See also People v. Sibrian, 207 Cal. Rptr. 3d 428, 430 n.2 (Cal. App. 2016) ("Holding a firearm at 'low ready' means holding a firearm in both hands 'pointed in a downward direction, so it's not pointed at any one person, but it's ready in case you have to deploy it.'").

Bellamy if he was asleep; Bellamy responded that he was. Officer Hirata then apologized, "Oh sheez, sorry to disturb you, 'cause I guess yeah one of your neighbors heard a bang and they thought it was gunfire coming from downstairs. Okay, sorry for disturbing your night." The officers left Bellamy's unit at 3:36:31 a.m., less than one minute after they entered.

While Officers Hirata and Torres inspected Bellamy's unit, a woman across the hall opened the door of Unit 2402. Corporal Marfil said, "Police, hi. Just making sure everything okay. Somebody said they heard like a loud pop or a bang, so we just making sure. Did you hear anything?" The neighbor responded, "No." Corporal Marfil then asked Bellamy, "Are you okay?" Bellamy responded, "No, not now."

On the way to the elevator, the officers decided against inspecting the units below Bellamy's apartment, explaining, "Odds are the people are in deep sleep so they're not gonna recall hearing it."

The declarations from each officer confirmed the relevant details of their investigation. Officer Hirata declared:

> I was equipped with an AR-15 rifle and held it in the low ready position while we waited to speak to [Bellamy]. [Bellamy] opened the door with one hand and kept the other out of sight. I asked [Bellamy] to see his other hand twice before he showed it. After [Bellamy] showed his other hand and I could determine he was not holding a weapon, I relaxed my grip on the rifle.

(Formatting altered.) Officer Hirata also stated that he "never pointed [his] AR-15 rifle at [Bellamy] during the duration of the investigation[.]"

Corporal Marfil and Officers Torres and Miranda all declared that they never unholstered their pistols or pointed any weapons at Bellamy during the encounter.

All four officers stated that they did not know who Bellamy was prior to the incident and did not harbor any malice or ill will toward Bellamy.

### 2. Bellamy's Evidence

Bellamy submitted a declaration in opposition to Petitioners' MSJ. Significantly, he did not object to the authenticity, accuracy, or clarity of Petitioners' video evidence.[6] Bellamy declared, "I am African[-]American and retired from United Airlines as a [f]light [a]ttendant." He was asleep when he "heard a loud knocking" on his door at 3:40 a.m. "When I opened the locked door, I saw an AR automatic rifle pointed right at me and a police officer shouting at me. I was extremely shocked and surprised and disoriented since I just woke up." (Emphasis added.)

---

[6]     Each officer authenticated their respective body-worn camera footage and indicated the exact time their cameras were activated.

Bellamy continued, "At least two officers told me to put my hands up.  I put one of my hands up and the officers demanded I put both hands up.  I had to open the door to show both my hands.  The officers kept asking me 'where's the guns, where's the guns.'"  (Formatting altered.)  Bellamy told the officers he "didn't have any guns" and averred that "[t]hey then came into my apartment looked around with a flash light [sic].  Then they left the apartment after seeing there were no guns and one told me he was sorry."  He also stated, "I did not consent for them to enter my apartment.  I felt threatened when they pointed weapons at me and felt I had no option but to let them into my apartment."  (Formatting altered.)

Bellamy further declared,

> I was in shock that this happened to me.  Just a few months earlier Breanna [sic] Taylor was killed in her own house and shot by police officers while she slept. . . . I was also very aware of what happened to many African[-]American men on the mainland who have been killed by police officers and who have been unarmed. . . . I suffered sleeplessness, nightmares, anxiety, paranoia, depression[,] and [post-traumatic] stress disorder.[7]

(Formatting altered.)

Bellamy also stated,

> While I was at the door my neighbor who is Asian[-]American opened her door to ask what was going on.  The four (4) police officers told her they were investigating gun shots and did not point any rifle at her or guns at her.  They

---

[7]     Bellamy also submitted the declaration of Dr. David Bevett, who was treating Bellamy for post-traumatic stress, anxiety, and depression "due to the police pointing an AR 15 automatic rifle and pistols at him[.]"

> did not ask to enter her apartment. They told her to go back to bed.

(Formatting altered.) He attested that "the officers did not go to any other apartment or hold guns to any of the other tenants and or [sic] residence" in the apartment building and that he did not commit a crime at the building on that day. Bellamy further described the psychological symptoms he experienced "[a]s a result of the officers pointing weapons at [him][.]"

### 3. Petitioners' Arguments

Relevant to our review, Petitioners argued that Bellamy was unable to establish genuine issues of material fact as to each of his claims, particularly in light of the key allegations from Bellamy's declaration that "blatantly contradict[ed] video and audio evidence[.]" Petitioners reasoned that the video and audio evidence showed that the officers executed their investigatory duties with due care, no officer pointed any firearm at Bellamy, there was no yelling or threats, and Bellamy gave the officers permission to enter his apartment.

Petitioners also asserted that Bellamy could not refute that the officers' actions were protected by qualified or conditional privilege because he could not show that the officers acted with malice.

Additionally, citing the U.S. Supreme Court's decision in Scott v. Harris, 550 U.S. 372 (2007), Petitioners argued that

12

when a declaration "blatantly contradicts video and audio evidence," "such declarations cannot create a genuine issue of material fact." They contended that Bellamy's "version of events is simply his own work of fiction[,]" and constituted the "epitome of mischaracterization of the video evidence." Petitioners maintained that "declaration statements that flatly contradict unequivocal video evidence must be disregarded on summary judgment."

### 4. Bellamy's Arguments

Relying on his declaration, Bellamy countered that he had raised genuine issues of material fact with respect to each of his claims. In particular, Bellamy contended that Petitioners engaged in an "unreasonable display of weapons at his direction," violated HPD policy, and entered his apartment via intimidation and coercion.

Bellamy also argued that Petitioners' qualified privilege defense should be decided by a jury because "[t]he existence of malice is 'generally a question for the jury.'" (Citing Runnels v. Okamoto, 56 Haw. 1, 5, 525 P.2d 1125, 1129 (1974).) Bellamy maintained that a "reasonable person" would find the officers' actions "improper and substantially certain to cause injury."

Bellamy further addressed Petitioners' argument that his declaration was contradicted by the video evidence, asserting

13

that credibility and weighing of the evidence were not matters for the court to decide on summary judgment. He argued that the video evidence actually supported his argument that Officer Hirata "displayed and brandished" a rifle at him. Bellamy concluded that, viewing the evidence in the light most favorable to him, summary judgment was improper.

### 5. Circuit Court Grants Petitioners' MSJ

Following a hearing, the circuit court granted Petitioners' MSJ and entered its final order on November 1, 2023.

### C. ICA Proceedings

Bellamy appealed to the ICA, arguing that the circuit court erroneously granted Petitioners' MSJ despite the existence of genuine issues of material fact and "credibility issues." Bellamy also asserted that the circuit court erred in finding Petitioners were entitled to qualified or conditional immunity.

Upon a de novo review of the record, the ICA found that Bellamy's declaration "directly contradicted video and audio from the officers' body-worn cameras." The ICA concluded that the circuit court erroneously granted summary judgment and vacated the circuit court's judgment.

In reaching this conclusion, the ICA declined to follow Scott, in which the U.S. Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is

14

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380. Instead, the ICA determined that this court's decision in Nozawa required vacating summary judgment. The ICA reasoned: "The jury must decide which version of events it believes; it is not for a judge, on a motion for summary judgment, to weigh competing evidence and determine which version of events should be accepted as true." The ICA continued, "This is so even when the opposing declaration is blatantly contradicted by video evidence supporting the motion." (Cleaned up.)

Additionally, the ICA concluded that there was a genuine issue of material fact as to whether qualified privilege applied. The ICA explained, "Bellamy's declaration, viewed in the light most favorable to him, is evidence of malice by the officers and creates a genuine issue of material fact."

## D.    Supreme Court Proceedings

Petitioners' primary contention on certiorari is that "this [c]ourt, the federal courts, and courts around the country have reached the common-sense conclusion that there must be a genuine issue of material fact in dispute to defeat summary judgment--

15

and that a dispute is not genuine where the non-movant's proffered evidence is blatantly untrue."

Bellamy reiterates that his declaration created genuine issues of material fact, and that "[a] reasonable jury could find on behalf of [Bellamy], that he was threatened, emotionally distressed, privacy invaded, Constitutional rights violated due to negligence, assault by threat, and suffered emotional damages."

### III.  DISCUSSION

The crux of this appeal is whether there were genuine issues of material fact as to Bellamy's causes of action.  See Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(c) (eff. 2000).

Given the undisputed, unambiguous video evidence that documented and demonstrated what occurred during the encounter between HPD and Bellamy, we find that Bellamy's declaration failed to establish a genuine issue of material fact as to any of Bellamy's claims.  Therefore, the circuit court properly granted Petitioners' summary judgment.

Separately, under the facts and circumstances of this case, the adoption of a new summary judgment standard, as reflected in Scott, is neither necessary nor warranted.  Our existing summary judgment jurisprudence provides a well-established legal

16

framework and analysis to review video evidence that conflicts with a non-moving party's affidavit.

## A. No genuine issues of material fact exist with respect to Bellamy's claims.

### 1. Summary judgment review.

We review a grant of summary judgment de novo. Nozawa, 142 Hawaiʻi at 338, 418 P.3d at 1194 (citation omitted).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." HRCP Rule 56(c). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Gima v. City and Cnty. of Honolulu, 156 Hawaiʻi 78, 88, 569 P.3d 1262, 1272 (2025) (citations omitted). The moving party may discharge their initial burden of demonstrating the absence of a genuine issue of material fact by showing that if the case went to trial, there would be no competent evidence to support a judgment for their opponent. First Hawaiian Bank v. Weeks, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989) (citing 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2727, at 130 (1983)) (moving party "may discharge his burden by

17

demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his opponent").

The non-moving party bears the burden of setting forth specific facts establishing a genuine issue for trial. Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai'i 277, 301, 172 P.3d 1021, 1045 (2007) (citation omitted). Although the court must draw all inferences and view the evidence in the light most favorable to the non-moving party, significantly, the court is permitted to "draw only those inferences of which the evidence is reasonably susceptible[.]" Ka'upulehu Land LLC, 136 Hawai'i at 132, 358 P.3d at 701 (citing Winfrey, 130 Hawai'i at 270-71, 308 P.3d at 899-900); cf. Rodriguez v. Nishiki, 65 Haw. 430, 441-42, 653 P.2d 1145, 1152 (1982) ("Viewing the record in the light most favorable to [the non-movant], there is a genuine issue of material fact from which a reasonable jury could conclude that there was no clear and convincing proof of [the non-movant's] actual malice." (emphasis added)).

2.  **The record evidence is not reasonably susceptible of a conclusion or inference that would support Bellamy's allegations.**

Applying this framework to the ICA's de novo review, we find that Bellamy failed to raise a genuine issue of material fact.  Bellamy submitted a declaration that, according to the

18

ICA, "directly contradicted" Petitioners' video evidence. That is, the ICA recognized the evidentiary competency issue between HPD's body-worn camera footage and Bellamy's statements that he saw an AR-15 pointed "directly at him," that two officers shouted to put his hands up and kept asking, "Where's the guns, where's the guns," and that he did not consent to the police entering his apartment.

The ICA summarized the video evidence as showing: (1) HPD knocked on Bellamy's door and announced their presence; (2) Bellamy cracked his front door open and waved a hand; (3) Officer Hirata asked Bellamy twice to see his other hand,[8] which Bellamy then showed; (4) Officer Hirata "never raise[d] his voice"; (5) the barrel of Officer Hirata's rifle was "pointed at the ground"; (6) Officer Hirata "never raise[d] his rifle"; (7) Officer Hirata explained to Bellamy that the upstairs neighbor heard what she thought was "gunfire" and asked Bellamy if he heard anything; (8) Bellamy responded, "You can come check everything in here, there's nothing in here[,]" and opened the door for the officers; (9) Officer Hirata "never pointed his rifle at Bellamy"; and (10) none of the officers unholstered their service pistols.

---

[8] Officer Hirata initially asked to see Bellamy's "hands," followed by two additional requests ("Can I see your other hand, please.") while Bellamy's left hand was out of view behind his front door.

Additionally, the parties did not dispute that HPD received a 911 report of a gunshot and the responding officers first went to the 911 caller's apartment to verify, in person, the details of the report with the caller. It was also uncontroverted that the 911 caller informed the officers that she had military experience and confirmed hearing a gunshot and smelling gunpowder. The caller stated that she believed the gunshot came from underneath her apartment unit, and only then did the officers proceed to Unit 2401, which was directly below. The parties did not dispute that HPD's actions were in response to the information that was provided to them by a third-party complainant.

As noted, Bellamy did not contend that the body-worn camera footage was doctored or manipulated in any way, nor did he raise the possibility that the video recordings may have failed to capture or omitted a portion of the incident. In fact, he argued to the contrary, contending that the video evidence "did not contradict [his] [d]eclaration of the events" but rather "corroborated him[.]" Had Bellamy asserted, for instance, that the video footage failed to capture the officers pointing their guns directly at him, or that the audio cut out as the officers shouted, "Where's the guns," or that a camera angle or lighting affected the accuracy or completeness of the recording, Bellamy

would have satisfied his burden to defeat summary judgment, as he would have created a genuine issue of material fact for the jury to decide.  Cf. Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 277 (4th Cir. 2011) (finding that a soundless and poor-quality video does not clearly or blatantly contradict non-movant's version of the events).  But by failing to dispute the authenticity or veracity of the video evidence, Bellamy implicitly conceded to the accuracy of the footage and the encounter it depicted.  That concession matters.  As we recently observed, a "[r]ecording creates a reliable and objective record of what was said, and the circumstances in which those words were spoken."  State v. Zuffante, 157 Hawai'i 194, 205, 576 P.3d 243, 254 (2025).

Accordingly, the record evidence was not reasonably susceptible of an inference or conclusion that the officers pointed a rifle "right at [Bellamy]," or "told [him] to put [his] hands up," and "kept asking [him] 'where's the guns, where's the guns.'"  Nor could a reasonable jury infer or conclude that the officers entered Bellamy's apartment without Bellamy's consent because the officers had pointed a rifle or handgun at him.  See Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Directors v. Venture 15, Inc., 115 Hawai'i 232, 277, 167 P.3d 225, 270 (2007) (citations omitted)

(noting that "summary judgment may not be granted unless reasonable minds can draw only one conclusion from the evidence").  The failure to create a genuine issue of material fact with respect to these key allegations was dispositive of Bellamy's claims.

Because the evidence viewed in the light most favorable to Bellamy was not "reasonably susceptible" of an inference or conclusion that would support Bellamy's allegations, Bellamy failed to raise a genuine issue of material fact sufficient to defeat summary judgment.

**3.  The circuit court properly granted summary judgment as to each of Bellamy's causes of action.**

Bellamy alleged negligence, assault by threatening, IIED, NIED, and invasion of privacy.  As Petitioners correctly note, "[a]ll of Bellamy's claims require that he prove that the four HPD Officers threatened him and/or unlawfully entered his home."[9] Each of Bellamy's claims was premised on some combination of the material allegations from his declaration, which include:

- "When I opened the locked door, I saw an AR automatic rifle pointed right at me and a police officer shouting at me."

---

[9]     See Hac v. Univ. of Hawaii, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003) (elements of IIED); Doe Parents No. 1 v. State, Dep't of Educ., 100 Hawai'i 34, 68-69, 58 P.3d 545, 579-580 (2002), as amended (Dec. 5, 2002) (elements of negligence and NIED); Mukaida v. Hawaii, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001), aff'd, 85 F. App'x 631 (9th Cir. 2004) (elements of assault); Restatement (Second) of Torts § 652B (elements of intrusion upon seclusion).

- "At least two officers told me to put my hands up. I put one of my hands up and the officers demanded I put both hands up."

- "The officers kept asking me 'where's the guns, where's the guns[.]'"

- "I did not consent for [the officers] to enter my apartment. I felt threatened when they pointed weapons at me and felt I had no option but to let them into my apartment."

As stated, Bellamy did not contest the accuracy or veracity of what was recorded and depicted in the body-worn camera footage. Rather, Bellamy's declaration simply mischaracterized and misconstrued what was depicted in the video recordings, despite his claim that the videos corroborated his declaration. Those recordings established that the officers specifically explained to Bellamy the reason for their presence; no officer raised their voice; no one told Bellamy to put his hands up; no officer said, "Where's the guns"; none of the officers pointed a firearm at Bellamy, unholstered their service pistols, or otherwise verbally threatened Bellamy; Bellamy voluntarily told the officers without any prompting, "You can come check everything in here, there's nothing in here," and then opened his door for the officers; and the officers' visual inspection of Bellamy's apartment lasted less than a minute, after which they exited and departed the scene. The evidence also depicted the officers' interactions with the 911 caller, who reiterated

her observations and indicated that she heard a gunshot coming from below her unit. Bellamy was thus unable to present competent evidence that would be reasonably susceptible of his key allegations. This failure thwarted Bellamy's effort to fend off summary judgment on this record.[10]

## B. ICA's reliance on <u>Nozawa</u> was misplaced.

The ICA relied on <u>Nozawa</u> in vacating the circuit court's judgment. In <u>Nozawa</u>, we held that a genuine issue of material fact was created by dueling declarations that presented a classic "he said, she said" dispute. 142 Hawai'i at 333, 418 P.3d at 1189. There, Nozawa filed a gender discrimination suit against her former employer alleging that the employer's proffered reasons for her termination were based on pretext. <u>Id.</u> at 334, 418 P.3d at 1190.

The employer moved for summary judgment, submitting evidence of Nozawa's purported poor work performance, including a warning letter sent to Nozawa prior to her termination that referenced continuing mistakes in discharging her duties as a dispatcher and a declaration attesting to the nondiscriminatory reasons for her termination. <u>Id.</u> at 334-35, 418 P.3d at 1190-91. Nozawa countered with her own declaration directly

---

[10]   Since Petitioners are entitled to summary judgment on the basis of Bellamy failing to establish a genuine issue of material fact, we need not reach the issue of qualified privilege.

24

contradicting the employer's evidence.  Id. at 335, 418 P.3d at 1191.

The circuit court rejected Nozawa's declaration, finding that it consisted of "uncorroborated, self-serving, conclusory statements" that were neither sufficient nor competent to establish a genuine issue of material fact.  Id. at 337, 418 P.3d at 1193.  The ICA affirmed.  Id. at 338, 418 P.3d at 1194.

On certiorari, this court held that summary judgment was improper, in part because statements in a declaration, even if self-serving, need not be corroborated by independent evidence to raise a genuine issue of material fact.  Id. at 339, 418 P.3d at 1195.

Nozawa is distinguishable from the present case.  In Nozawa, the record evidence was "reasonably susceptible" of favorable inferences and conclusions for Nozawa based on her declaration, thus creating a genuine issue of material fact. Id. at 340, 418 P.3d at 1196 ("Because Nozawa did not express a conclusion without stating the underlying facts or reach a conclusion that was not reasonably drawn from the underlying facts . . . these statements were not conclusory and were in compliance with HRCP Rule 56(e).").  As stated, the competing declarations in that case reflected a "he said, she said" contest.  Moreover, Nozawa's declaration contested the validity

25

of her employer's evidence. In particular, Nozawa asserted that although she had been given warnings by her employer, she had been falsely accused of making mistakes in her job. Id. at 335, 418 P.3d at 1191.

But here, the record evidence was not reasonably susceptible of supporting Bellamy's key allegations. In vacating summary judgment, the ICA wrote, "The jury must decide which version of events it believes[.]" But because Bellamy was unable to produce competent evidence to support his allegations, reasonable minds could only draw one conclusion from the evidence, even when viewing the evidence in the light most favorable to him. If "the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances," summary judgment should be granted. Id. at 344, 418 P.3d at 1200.

Additionally, affirming an overextension of Nozawa would set a potentially perilous and impractical precedent. Consider a scenario in which Petitioners submitted the same uncontested, unambiguous video evidence, but Bellamy's declaration stated that the officers kicked down his door, threw him to the ground, put a gun to his head, and screamed, "Where is the gun?" Under an expanded interpretation of Nozawa, Petitioners would not be

entitled to summary judgment regardless of how far-fetched Bellamy's declaration may be in light of the undisputed video evidence, so long as his declaration was construed as being based on his purported perceptions and personal knowledge.  In other words, the case would proceed to trial, even if the conflict in the evidence relating to material facts were not genuine or the evidence were not competent.  Such an outcome would undermine the purpose of summary judgment and HRCP Rule 56 and would essentially allow any litigant to reach trial by simply submitting a competing declaration based on their purported perceived facts and personal knowledge.

Our long-established and enduring summary judgment standards already provide that a court can only draw inferences and conclusions of which the evidence is reasonably susceptible to assess the existence of any genuine issue of material fact. Ka'upulehu Land LLC, 136 Hawai'i at 132, 358 P.3d at 701.  This constraint provides a pragmatic and sensible safeguard that promotes judicial economy and relieves parties from the burdens of meritless litigation, while ensuring that courts do not infringe upon a party's right to a trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) ("[Federal] Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact

27

to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.").

## IV.   CONCLUSION

The ICA's December 22, 2025 Judgment on Appeal is reversed, in part, to the extent it vacated the circuit court's grant of summary judgment on Bellamy's claims.  The circuit court's November 1, 2023 Judgment is affirmed in its entirety.

Sheena M. Crail
(Nicolette Winter on the
briefs) for petitioners

Daphne E. Barbee
for respondent

/s/ Vladimir P. Devens

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Steven R. Nichols

